WOODS v. CHICAGO & GRAND TRUNK RAILWAY CO.

1. MASTER AND SERVANT—INJURY TO RAILROAD EMPLOYÉ—DEFECTIVE MACHINERY—NEGLIGENT INSPECTION—EVIDENCE.

Plaintiff, a locomotive engineer in defendant's employ, was injured by the explosion of the boiler of the engine, alleged to have been caused by the negligence of the defendant in not properly inspecting the boiler, and in permitting its use when a large number of its stay-bolts were broken. The last hammer test was made by two of defendant's inspectors not more than 14 days before the explosion. One of the inspectors testified that, if the bolts were broken off, but the ends were tight together, there might be very little difference in the sound of the hammer and the jar from what there would be if they were solid,—not enough to convince him that they were broken; that, if there were four bolts broken in a row, their discovery might depend upon whether or not the sheet was sprung. There was testimony tending to show that at least 90 per cent. of the broken bolts could have been discovered by the hammer inspection; that a large number of bolts had been broken for so long a time before the injury that their ends had become smooth; that the process of wearing them smooth must necessarily have been very slow; and that

these bolts break gradually.   *Held,* that it was a question for the jury whether or not a proper hammer inspection was made.

2. SAME—INFERENCE OF NEGLIGENCE.

Even though the proof of the plaintiff depended upon inference to establish the main fact, the question whether or not that inference was sufficiently rebutted was for the jury; the rule being different than where the defense consists of a distinct fact, not inconsistent with the plaintiff's proofs.

3. SAME—NOTICE OF DEFECTS.

Defendant's locomotive inspector testified that, four days before the accident, he examined the left side of the fire-box, and that it was leaking badly; that he noted this fact in a book kept for that purpose, with an instruction that the fire-box be examined; and that it was the duty of one B. to examine it and see to its repair.   B. testified that he made said examination, and stopped the water squirting from the mouthpiece on the left side, after which there was nothing to indicate that there was anything wrong; that he reported this repair, but did not, as was his duty, note on the book the fact of such examination.   *Held,* that it was competent for the jury to infer that the inspector of engines was right in saying that there was a leak on the left side of the fire-box, and that a careful examination at that time would have disclosed a defective condition of the boiler, and prevented the accident.

4. SAME—REASONABLENESS OF INSPECTION—INSTRUCTIONS TO JURY.

The circuit judge instructed the jury that, if they should believe from the evidence that the engine was overhauled and inspected, and subjected to the hydrostatic test, by competent men, within two years from the time of the explosion, and also thoroughly and carefully tested by the hammer test, by competent testers, within 30 days of the explosion,—it appearing from the testimony that those ways of testing had been adopted by railway companies as the best tests they could give,—then defendant had done all that it could be asked to do, and was not guilty of the negligence charged.   *Held,* that this instruction defined what would, as a matter of law, be a reasonable inspection, and what would constitute a reasonable time, and that it operated to remove all ground for an objection that earlier portions of the charge were not sufficiently definite in these particulars.

5. SAME—EVIDENCE.

A witness who had not counted the old breaks, but who

showed sufficient knowledge to enable him to estimate the number, was properly permitted to give such estimate.

6. SAME—OPINION EVIDENCE—COMPETENCY OF WITNESS.
    A witness who had been a locomotive engineer for five or six years, who had known stay-bolts to break, and seen them taken off, and who had been in railroad shops a great deal during the time mentioned, was competent to testify whether the bolts examined by him had been recently broken.

7. SAME—EXCESSIVE DAMAGES—DISCRETION OF CIRCUIT JUDGE.
    Defendant moved for a new trial on the ground of excessive damages. The verdict was for $6,500. Plaintiff was 31 years old when injured, and was earning $103.54 per month. The proofs tended to show that he was disabled from following his profession, and was able to do scarcely any work of any kind, and that in all probability his disability was permanent. *Held*, that the discretion of the circuit judge in denying the motion would not be overruled.

Error to Calhoun; Smith, J. Submitted January 9, 1896. Decided February 26, 1896.

Case by William Woods against the Chicago & Grand Trunk Railway Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*Geer & Williams* (*E. W. Meddaugh*, of counsel), for appellant.

*M. L. Howell*, for appellee.

MONTGOMERY, J. The plaintiff was a locomotive engineer in the employ of the defendant. On the 13th of June, 1892, while he was engaged in running engine No. 29 in the usual and customary way, and, as he testified, with no more pressure than usual, and with less than was allowed, the boiler exploded, and by force of the explosion the plaintiff received serious injuries. The negligence imputed to the defendant was in not having inspected its boiler properly, to ascertain whether it was in safe condition, and in permitting its use when in bad repair, by the reason of a large number of stay-bolts

being broken, and others corroded, and permitted to remain so for a long time, to wit, 30 days, prior to the injury.

The rule relating to the duty of the defendant in supplying appliances for the use of its employés is well settled. While not an insurer, it is nevertheless its duty to use reasonable and ordinary diligence in providing safe machinery and appliances in the first instance, and, by continued inspection at such intervals as the reasonable and proper conduct of such a business requires, to ascertain whether the appliances continue in safe condition, and, if unsafe, to put them in safe condition. The master is not responsible for latent defects, not discoverable by inspection; but, to the extent that this duty of inspection goes, it is the master's duty, which he cannot escape or delegate. *Anderson* v. *Railroad Co.*, 107 Mich. 591; *Tangney* v. *J. B. Wilson & Co.*, 87 Mich. 455; *Fuller* v. *Jewett*, 80 N. Y. 46 (36 Am. Rep. 575); *Ford* v. *Railroad Co.*, 110 Mass. 259. The defendant's counsel do not contend against the rule as stated, but assert that the evidence in the present case shows conclusively that the engine was originally constructed in the proper manner; that proper inspection was made at such intervals as was usual and customary in good railroading, and that there was no direct testimony disputing the testimony of defendant's witnesses called to prove such inspection, and no evidence from which neglect in this respect could be inferred; and, furthermore, though the court should be of opinion that evidence adduced by the plaintiff tended, by inference, to show the want of proper inspection, the positive testimony adduced by the defendant repelled such inference, so that at the close of the testimony it was the duty of the court to direct a verdict for the defendant.

The testimony offered by the plaintiff tended to show that the stay-bolts connecting the inner and outer sheets of the boiler, and supporting and sustaining them, had become broken, to the number of about 50 or 60, and had

been broken for a sufficient length of time before the explosion so that the ends had become worn smooth; that the material of which the boiler was constructed was of the first quality, and could not explode if kept in good repair; that hydrostatic and hammer tests, employed by this defendant and other companies, when properly conducted, were, either, sufficient to show the presence of broken bolts; that, by the hammer test, at least 90 per cent. of the broken stay-bolts could be discovered. The last hammer test which defendant's witnesses claimed to have made was about the first of June,—not more than 14 days before the explosion. It is contended that these broken stay-bolts show by their appearance that they must have been broken for a much longer period, in order that the broken ends should become worn smooth. It is difficult to account for these broken ends, yet it is a fact, established by credible testimony, that they were smooth. Various theories are advanced by plaintiff's counsel as to what caused the smooth ends of the broken parts, any of which would imply that considerable time must have elapsed after the breakage, and before the broken parts could be in the condition presented after the explosion. The two witnesses who made the hammer test on or about the 1st of June are Mr. Hunter and Mr. Keeley. Keeley testified on cross-examination that if the stay-bolts were broken off, but the ends were together pretty tight, there might be very little difference in the sound of the hammer and the jar from what there would be if it were solid,—"not enough to convince me it was broken." He further testified that if there were four stay-bolts broken in a row, whether they were discovered or not might depend upon whether the sheet was sprung, There was other testimony tending to show that 90 per cent., at least, of the broken stay-bolts would be discovered by the hammer inspection. We think, in view of this testimony, and the testimony which tended to show that a large number of the stay-bolts were broken a sufficient length of time before the injury so that their ends had become worn smooth, and that

the process of wearing them smooth must have been very slow, according to any theory, and in view of the fact that the testimony shows that these bolts break gradually, it became a question for the jury whether the witnessess Hunter and Keeley made a proper hammer test at the time stated. If their testimony could not be disputed in the manner adopted in this case, it follows that, however incredible the surroundings may make their testimony that they performed their full duty, their testimony must be accepted as true. Even though the proof of the plaintiff depended upon inference to establish the main fact, yet whether the inference was sufficiently rebutted was a question for the jury. *Crosby* v. *Railway Co.*, 58 Mich. 458; *Hagan* v. *Railroad Co.*, 86 Mich. 615. The rule is different if the defense consists of a distinct fact, not inconsistent with the proofs offered by the plaintiff.

There is other significant testimony in the case, which not only has a direct bearing on the question of whether a proper inspection was made, but tends strongly to show subsequent negligence by defendant's servants, if it does not show such negligence conclusively. James Spearman was locomotive inspector for the defendant. On the 9th day of June, four days before the accident, he discovered defects, which he noted in a book kept for this purpose, as follows: "Put bolt in right jaw of engine truck, and tighten up others all around. Examine left side of fire-box; leaks badly." He testified on the stand that he examined the left side of the fire-box, and that it was leaking badly, and that it was the duty of Thomas Browning to examine it and see to its repair. This witness was called, and, on cross-examination, testified as follows:

"*Q.* While you were there, what did you notice at the left side?

"*A.* I noticed nothing at the left side,—only the water squirting from the mouthpiece on the left side. After stopping that, there was nothing to indicate there was anything wrong.

108 Mich.—26.

" Q. The inspector who reported there was a leak there was mistaken?

" A. He was mistaken.

" Q. Either he or you were mistaken?

" A. I know I was not mistaken.

" Q. You are sure of that?

" A. Yes, sir.

" Q. Did you make any entry besides this?

" A. No, sir; because I did not think there was any need of it.

" Q. You reported the mouthpiece corked?

" A. Yes, sir.

"Q. You did not say anything about whether there was any leaking, or whether you had examined this?

"A. No, sir; because—

"Q. (interrupting). Never mind why. The way that was given here was this: 'Examine left side of fire-box; leaks badly.' You were not required to do anything but examine, and you didn't think it worth while to report you had examined it, did you?

"A. There was nothing there leaking.

"Q. After you had found that there was nothing there to show that it was leaking, wasn't it your duty to put on this book that you had examined it?

"A. There is lots of work we don't put on that book.

"Q. Was it not your duty to put it on that book?

"A. It might have been.

"Q. Wasn't it?

"A. Well, yes.

"Q. Well, why didn't you do so? Why didn't you do it?

"A. Because there was nothing there to enter. There was nothing there to be done. There was nothing wrong.

"Q. If there was any work to be done— Supposing a stay-bolt had been broken, or was broken.

"A. Then I would report it.

"Q. Who found out whether there were any stay-bolts broken,—you?

"A. I would have found out.

"Q. Don't you have two inspectors?

"A. Yes, sir.

"Q. Was it not your duty to report to them about this requiring an examination, instead of making it yourself?

"A. If I found anything wrong.

"Q. They were the fellows to go there and find anything wrong, were they not?

"*A.* I very often found things wrong, and reported them.

"*Q.* Who was this entry made by,—about the leaking fire-box?

"A. By Spearman, the inspector of engines.

"*Q.* Is he over or under you?

"*A.* He is over me."

In view of the peculiar nature of this testimony, it was certainly competent for the jury to infer that Spearman was right in saying that there was a leak on the left side of the fire-box, and that it was not attended to, and that a careful examination at that time would have disclosed a defective condition of this boiler, and prevented the accident.

This testimony is important to be considered in connection with defendant's criticism of the instruction to the jury:

" It was the duty of the defendant to exercise reasonable care and skill in keeping its boiler in a reasonably safe condition; and, if need be for the accomplishment of that purpose, it was its duty to frequently inspect, examine, and test its strength and sufficiency. If any defect existed which a reasonably careful test or inspection would have discovered, the defendant should have had notice of such defect, and is responsible for it. * * * If the stay-bolts were broken for some considerable time before the explosion, and if you believe that a reasonably careful examination of the boiler within such time would have disclosed such defects, it was the defendant's duty to have known of such defects."

In view of the foregoing testimony, it is difficult to see how defendant could have been damaged by this instruction; for it appears that here was a discovered leak, suggesting inspection. There can be no doubt that a proper inspection, by the hammer test, at that time, would have disclosed the defect which resulted so disastrously four days later; and it would have been error for the court to have charged, as matter of law, that the defendant's agents were not negligent in attending to the defect.

But a further answer to this criticism is that the court afterwards charged the jury specifically as follows:

"These ways or manners of testing, as shown by the evidence, are adopted by railways as the best tests they can give. I refer to the inspections and tests which have been shown you are in general use regarding locomotive engines. And if you believe from the evidence given you in the case that these tests were made—actually made—by the defendant; that is, that this engine was overhauled and inspected, and subjected to the hydrostatic test, by competent men, within two years of the time of the explosion, and also thoroughly and carefully tested by the hammer test, by competent testers, within 30 days from the time of the explosion,—I say, if you find these tests were made, then defendant has done all that it can be asked to do, and would not be guilty of negligence, and ought not to be held in this action."

This instruction defined what would, as a matter of law, be a reasonable inspection, and what would constitute a reasonable time, and could not have been misunderstood by the jury.

Error is assigned upon the admission of testimony by a witness of the plaintiff, giving his judgment as to the length of time the stay-bolts had been broken. But no objection or exception was taken to this testimony. Objection was made to his testifying to the number of old breaks, but on the ground that he did not count them. This objection was not good, as he gave an estimate, and showed sufficient knowledge to entitle him to do so. Objection was made to the question, "What do you say as to whether these stay-bolts that you speak of as old breaks were recent?" This was objected to for the reason that he had not shown himself competent, but we think he was competent to answer this question. He had been a locomotive engineer for five or six years, and had known stay-bolts to break, and had seen them taken off, and had been at the Battle Creek shops a great deal during that time.

The court charged the jury as follows:

"It is the province of the jury to pass upon the credibility or truthfulness of witnesses. They go upon the stand here. You see them; you note their demeanor and their bearing, and the reasonableness of what they tell before you; and from all these things you pass upon their credit, as to whether they are telling the truth or not. Now, in this case there, perhaps, may be some conflict of testimony. At any rate, it has been suggested here that some of the witnesses have not testified to the facts just as they were. It is for you, taking into consideration their surroundings, the interest they may have in the case, if any, their bearing upon the stand, and the reasonableness of their story, to say whether they have told the truth or not. You are not obliged to believe a person because he swears to a thing, but you should be governed by those elements of common sense which guide you in determining the truth of matters in every-day life; bearing in mind, of course, that witnesses are under a solemn oath."

This is excepted to, and, it is said, must have been understood by the jury as applied to Hunter's and Keeley's testimony, and that it was not proper, for the reason that they were uncontradicted; but, as we have already stated, it was a question for the jury as to whether there was not contradiction in the testimony offered by the plaintiff.

Defendant moved for a new trial on the ground of excessive damages. The verdict was for $6,500. Plaintiff was 31 when he received the injury, and was drawing $103.54 per month; and the proofs tend to show that he is now disabled from following his profession, and is able to do scarcely any work of any kind, and that he is probably permanently disabled. We do not, under these circumstances, feel warranted in interfering with the discretion of the circuit judge, who saw the plaintiff, and could better judge of his condition than we can.

Judgment affirmed.

The other Justices concurred.