BEUNK *v.* VALLEY CITY DESK CO.

1. NEGLIGENCE—BOILER EXPLOSION—PRIMA FACIE CASE.
   In an action for injuries caused by the explosion of a boiler,
   evidence that the boiler, though adapted to a pressure of not
   more than 60 pounds, was run with the safety valve set to
   blow off at 90 pounds, and that, to defendant's knowledge, it
   was carrying a pressure of over 80 pounds at the time of the
   accident, together with the testimony of experts, based on
   an examination of the boiler after the accident, that the ex-
   plosion was caused by overpressure, was sufficient to make a
   *prima facie* case.

2. SAME—EXPERT TESTIMONY.
   Such expert testimony was properly admitted, the witnesses
   · having stated the grounds for their opinions.

3. SAME.
   Expert testimony was also admissible on the issue of whether
   or not the safety valve had been negligently and unskillfully
   repaired.

4. SAME—CORPORATIONS—AGENCY—ADMISSIONS.
   But statements made in a casual conversation by the manager
   of the defendant corporation, after the accident, were not
   competent as admissions of the corporation.

Error to superior court of Grand Rapids; Newnham, J.
Submitted October 10, 1901.   Decided November 4, 1901.

Case by William Beunk, Jr., against the Valley City
Desk Company, for personal injuries.   From a judgment
for plaintiff, defendant brings error.   Reversed.

*T. F. & W. R. McGarry*, for appellant.

*Hatch & Wilson*, for appellee.

HOOKER, J.   The plaintiff worked at a boring machine
in defendant's factory, in proximity to a brick wall, be-
yond which was the boiler-room of the establishment.
An explosion of the boiler caused the wall to fall upon

and injure him. He recovered a judgment against the defendant in an action for negligence, and defendant has appealed.

The declaration, as originally filed, counted upon the wanton and negligent maintenance of a weak boiler and an undue pressure. Plaintiff's proofs were made, and after the denial of a motion to direct a verdict on behalf of the defendant, and the introduction of some testimony by the defense, a count was added by leave of the court, charging the defendant with wantonly and negligently employing an unqualified man for engineer, who attempted to remedy a defect in the safety valve, and that, by reason of his attempted and unskillful repairs, the explosion resulted. It is contended that the plaintiff failed to make a *prima facie* case, and that the verdict should have been directed.

There was testimony tending to show that the boiler was not one which could be safely subjected to a pressure of over 60 pounds, that it was run with a safety valve set to blow off at 90 pounds, and that the boiler, immediately before the explosion, carried over 80 pounds of steam, and that this was necessary to perform the work expected of it, and that the defendant knew and directed it. There was also testimony that an inspection of the boiler, made after the explosion, indicated, in the opinion of the witnesses, that the explosion was from over steam pressure. Error is assigned upon the admission of some of this testimony, but, assuming it to be admissible, we think it made a case for the jury. We find no evidence of wantonness, and we are not advised that the case went to the jury upon that theory.

The boiler had been in use a number of years, having been made about 1888, and a year later repaired, by a boiler maker named Brobst. The boiler was in charge of an engineer, and there was testimony tending to show that he was a competent man. There was also proof that it was usual for the engineers employed similarly to clean and inspect their boilers at proper intervals, and to make

adjustments and ordinary repairs of the boilers and machinery under their charge, and that such was the custom of the defendant's engineer. It was shown, and not disputed, that in January, 1898, a tube began leaking in this boiler. A qualified person was employed to make repairs, and upon examination the back head of the boiler was found to be fractured. The defendant's manager was informed of it, and advised that it should have a new head. He replied:

" ' Well,' says he, ' we are very busy in the shop, but I want things right.' He says, ' Can you hurry things along ?' I said, ' It won't take much longer; we will put on a double gang, and work the job night and day;' and so he consented, saying, ' Yes, I won't run no chances; I want it right.' He said he wouldn't run any chances; he wanted the boiler made safe; and we took the head out and examined the shell inside; had it cleaned inside; pounded it with a hammer, and sounded all over, and had the scale pounded off, and the boiler makers and I went inside and underneath, and examined it to see if there were any corroded places in the boiler shell, and we didn't find any. Then the job was worked with a double gang,—a gang over there nights and daytimes. There were from nine to twelve men working on the job at that time, and we all conceded it was a good, safe repaired boiler. When I turned the boiler over to Mr. Hodges, after we got through repairing it, in my opinion it was safe and sound, and I pronounced the boiler safe. Before I turned the boiler over to Mr. Hodges, I applied upon it a hydraulic test of 125 pounds pressure. According to my experience, after a boiler is subjected to 125 pounds hydraulic pressure, it would be safe at between 90 to 100 pounds. It would be safe, in my opinion, to work every day at 90 to 100 pounds. When I had the head out of the boiler, and made the examination, in hammering I did not discover any flaws or lagging or blistering in the shell. This work was done by myself and the man who worked under me. I was right in under the boiler and on the inside myself after the head was taken out, and I saw no defects of the character mentioned. When the hydraulic pressure was put upon the boiler, I discovered no leaking of water through the seams. There was a slight sweating from the new work, and a little in the

calking where the new head was put in.   That is gener-
ally so when you fill a boiler up.   The sweating is pro-
duced by the difference in the temperature on the inside
of the boiler and that on the outside.

"*Q.* I say when the boiler had been completed you con-
sidered it a safe and sufficient boiler, did you not?

"*A.* Yes, sir."

This testimony was uncontradicted, so far as the state-
ments of fact contained in it are concerned.   The engineer
testified that the boiler always blew off at 90 pounds; that
it did so the morning of the accident; that, on the day of
the accident, the safety valve and steam gauge were in
perfect working order, and that, four or five seconds before
the accident, he had between 80 and 85 pounds of steam;
that he had just looked at the steam, and turned around,
when the explosion occurred.

The boiler maker, Brobst, was called as a witness for
the plaintiff.   He testified that he made the boiler in 1888
or 1889,—possibly 1887.   A year later he took it to his
shop, and repaired it.   It had been fired without water,
and the bottom had sagged down.   He put a new bottom
into it and fixed it as good as new.   He next saw it after
the explosion, and looked the plates and tubes over, to see
if he could determine the cause of the explosion.   He was
asked the result of his observation, and, under objection,
was allowed to state:

"From what I could find on the boiler, the explosion
was caused by overpressure,—overloading."

He afterwards stated the reasons and evidences which
led him to believe that it did not result from low water.
He testified that the plates were very hard and crystalized,
and was then asked:

"*Q.* Did you notice any other peculiarity about the
explosion?

"*A.* Nothing to indicate anything else, only that the
boiler had an overload,—more than she could carry.
From the plates there was no indication of low water."

He also testified that the hydrostatic test is the only

practicable one to make after repairing a boiler, and should enable a boiler maker to know whether the boiler is capable of standing any pressure. He testified that his examination, after the accident, showed the boiler clean, free from scale, and in fair condition, and he could discover nothing which indicated a want of proper care. He gave it as his opinion that from 50 to 60 pounds of steam would be a big load for that boiler to carry. He also testified that, when he repaired the boiler, he made it as good as a new one, and put on 150 pounds hydraulic test.

There was evidence tending to show that, some weeks before the accident, the safety valve leaked steam. After grinding the seat without remedying the trouble, the engineer discovered that the valve did not sit down square, owing, as he thought, to the effect of the weight, which was on one side. Thereupon he put on a lever and ball on the opposite side, which cured it, not increasing the pressure necessary to raise the valve. He testified that it worked all right, and blew off at 90 pounds the day of the accident, and that he did this work without instruction. Brobst testified that he never saw a valve fixed that way, and that in his opinion it was not safe.

Brobst was also permitted to testify to a conversation with Hodges, defendant's manager, when he was at the scene of the accident, after the explosion. He said:

"*A.* He was standing alongside of the brick pile there where the boiler stood; had some men working there; and I said to him, 'It is quite a bad accident you had here.' He said, 'Yes.' I said, 'It might have been worse.' He said, 'Yes; it might have been worse.' I said, 'What steam pressure were you carrying?' He said, 'The engineer said we had 95 pounds.'

"*Mr. McGarry:* I believe that is hearsay; I will object to it as hearsay.

"*The Court:* It may be received.

"*Mr. McGarry:* Note an exception.

"*The Witness* (continuing): He says, 'It came on cold the last couple of days, and we had to run the pressure up in order to heat the building and do our work.' He said, 'We have a new boiler ordered, but have been unable to get it in.'

"*Mr. McGarry:* I object to that as absolutely incompetent and irrelevant.

"*The Court:* It will be received.

"*Mr. McGarry:* Note an exception. . I move to strike out that statement.

"*The Court:* Overruled.

"*Mr. McGarry:* Note an exception.

"*Q.* Was there anything further said?

"*A.* That was about all the conversation I had with him. I walked over to the boiler, and looked it over. I told him 95 pounds was awful big pressure to carry on that old boiler.

"*Mr. McGarry:* I object to it as incompetent.

"*The Court:* The objection is overruled.

"*Mr. McGarry:* Note an exception.

"*Q.* Go on.

"*A.* I told him 95 pounds was too much to carry on that boiler. He said, 'Yes;' that they had run the pressure up for the last couple of days on account of being cold, but the new boiler that they had ordered they hadn't been able to get in yet.

"*Q.* Was there nothing further said?

"*A.* That was about all.

"*Mr. McGarry:* I move to strike out the entire testimony of the witness in reference to the conversation with John Hodges.

"*The Court:* Overruled.

"*Mr. McGarry:* Note an exception."

Several questions are raised upon the testimony of Brobst. It is said that it was error to permit him to express an opinion upon the cause of the accident, or upon the safety of the valve as repaired; but we think that the former was proper, in view of his explanation and reasons subsequently given. As to the repair of the valve, it was a mechanical device, original with the maker apparently, and only experts would be competent to determine its efficacy or safety. Brobst was shown to be competent to testify upon the subject as an expert.

The alleged statements of Hodges were received as admissions of the defendant corporation. They were not made in any transaction in the line of his duty, but occurred, if at all, in a casual conversation after the explo-

sion. Hodges was an agent of the company, and as such had no authority to bind it by admissions of this character, which did not accompany any official act. See *Andrews* v. *Mining Co.*, 114 Mich. 379 (72 N. W. 242), and cases cited; *Peek* v. *Novelty Works*, 29 Mich. 313; *Kalamazoo Novelty Manfg. Works* v. *Macalister*, 40 Mich. 89; *Maxson* v. *Railroad Co.*, 117 Mich. 222 (75 N. W. 459). See, also, *Three Rivers Nat. Bank* v. *Gilchrist*, 83 Mich. 255 (47 N. W. 104); *Bond* v. *Railroad Co.*, 62 Mich. 651 (29 N. W. 482, 4 Am. St. Rep. 885); *Roux* v. *Lumber Co.*, 94 Mich. 611 (54 N. W. 492). .

It is said by plaintiff's counsel that the latter case sustains their position. That case recognizes the general rule stated above, but holds that the error was cured by the subsequent testimony of the agent alleged to have made the admission. This case should be distinguished, as it falls within the rule laid down in the opinion of Mr. Justice MOORE in the case of *Van Alstine* v. *Kaniecki*, 109 Mich. 322 (67 N. W. 502). As in that case, this testimony was offered as substantive admissions of the principal. Not only that, but the witness was permitted to state his opinions, then and there expressed to the agent, as to the matter under discussion. This testimony was clearly erroneous and injurious.

We think it unnecessary to discuss the other assignments of error. The judgment is reversed, and a new trial ordered.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred. GRANT, J., did not sit.