### BEUNK *v.* VALLEY CITY DESK CO.

1. INJURIES TO SERVANT—BOILER EXPLOSION—NEGLIGENCE—EVIDENCE.

    Where, in an action by an employé for injuries caused by the explosion of a boiler, alleged to have been due to overpressure, it appeared that the boiler had recently been repaired and tested by a competent workman, who had pronounced it safe to be operated under a pressure higher than that carried at the time of the accident, and that it had been successfully operated for several years under such higher pressure, and all of the expert witnesses testified that they should have thought it capable of withstanding it, a verdict should have been directed for defendant.

2. SAME—INSTRUCTIONS—DEGREE OF CARE.

    An instruction in such action that it was the duty of defendant to furnish a safe and suitable boiler, and then keep it in that condition, and that defendant was bound, in using it, to keep within the limits of safety, was erroneous as imposing too high a degree of care; reasonable care only being required.

Error to superior court of Grand Rapids; Newnham, J. Submitted January 16, 1903. (Docket No. 53.) Decided June 23, 1903.

Case by William Beunk, Jr., against the Valley City Desk Company, for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

*William R. McGarry* (*Knappen, Kleinhans & Knappen,* of counsel), for appellant.

*Hatch & Wilson,* for appellee.

GRANT, J.  For a statement of this case and the issues involved, see 128 Mich. 562 (87 N. W. 793).

The sole claim of liability is that the boiler exploded from overpressure.  This depends solely upon the testimony of one expert witness that, in his opinion, the boiler exploded from that cause.  The liability of defendant upon this record must be considered and determined in the presence of the following facts, established by the testimony of the expert witnesses of both sides:

1. Steam boilers may explode, even when all precautions possible have been taken to determine their soundness. One of the expert witnesses for the plaintiff, and the maker of the boiler, testified:

"I think it [the boiler here involved] would be likely to blow up at any time, and liable to blow up at 40 pounds, too.  Boilers are liable to blow up from various causes.  I consider a boiler as dangerous as a keg of powder with a lighted candle around it.  That is the natural way of looking at it.  That is true of all boilers."

Another expert testified:

"There is always danger around a boiler.  It is liable to go off at any pressure, and that is as true of new boilers as of old ones."

Still another testified:

"Explosions in manufactories are of comparatively quite frequent occurrence, and always have been.  Occasionally a new boiler explodes, as well as an old one.  It is difficult to determine just what the exact cause of an explosion is, there being always a question of possibility one way or another from the nature of the explosion, because quite generally, when an explosion occurs, it takes with it all evidence of its cause."

The expert testimony on the part of the defendant is to the like effect.

2. "There is no positive duration to the life of a boiler. It all depends upon its use during the time it is being operated, and they are all more or less under the control of the engineer, and the various conditions that exist."

3. Manufacturers are justified in using boilers when made and repaired by responsible boiler makers, upon the assumption that they are safe, and are not liable for explosions when used in a proper manner.

Plaintiff's main expert witness testified:

"If the boiler maker was responsible, I should think you would be warranted in using the boiler he had turned over to you after pronouncing it safe. As a matter of fact, that is the usual custom among boiler manufacturers. All manufacturers defer to the opinion of the boiler maker in accepting a boiler, whether new or repaired, as safe."

His other expert witness testified as follows:

"Q. If a boiler maker had repaired the boiler, and had subjected it to a hydrostatic test, and turned it over to the manufacturer after pronouncing it safe to work at a given steam pressure, would it be allowable and customary among manufacturers to accept the opinion of the boiler manufacturer as binding and conclusive?

"A. It would."

One of the plaintiff's expert witnesses testified as follows:

"Q. If this boiler, for a period of 11 years, had been subjected to a steam pressure of 100 or 105 pounds, in constant use, what effect would that have upon the boiler?

"A. In my opinion, it would practically condemn the boiler for usage."

Another of his expert witnesses testified as follows:

"Q. What, in your judgment, would be the safe working pressure of this boiler in October, 1898, it having been operated 11 years at a pressure of 100 to 105 pounds, and a year or so after that at 90 pounds?

"A. That information would not be sufficient to base any judgment on. In fact, a person, to determine or base any judgment on the actual safe working pressure of a

boiler after that term of years of service, would of necessity make an examination of the boiler itself."

The mere fact of the explosion is not, alone, evidence of overpressure. The only evidence of the pressure at the time comes from two of plaintiff's witnesses,—Mr. Raynourd, the engineer in charge, who testified that, only four or five seconds before the explosion, the steam-gauge showed a pressure of 85 pounds, and Mr. Lindeman, who testified that he looked at the gauge from 15 to 20 minutes before the accident, and it was carrying somewhere between 80 and 90 pounds. There is no reason to discredit the testimony of the engineer, and his is the only testimony showing the pressure immediately before the accident. This engine had been in use about 13 years prior to its use by the defendant, and had been used by it about one year. For four years prior to its use by defendant, the safety valve was set to blow off at 105 pounds, and, while in use by the defendant, at 90 pounds.

The testimony upon the safe working pressure of this boiler is as follows: Henry Balcom, who had run this engine for four years prior to its purchase by the defendant, an engineer of 30 years' experience, testified: "I considered the boiler safe at 105 pounds steam pressure." Byron Parks testified: "In my judgment, the safe working pressure of the boiler would be somewhere between 85 and 90 pounds when new." Mr. Raynourd, the engineer who was running it at the time, testified: "I considered it capable of standing at least 95 pounds per square inch at a safe working pressure." These three were witnesses for the plaintiff.

For the defense, Mr. Meyer, superintendent of the board of public works of the city of Grand Rapids, formerly chief engineer of the street-railway company, who had been for 12 years the chief engineer of manufacturing concerns, had run locomotives, had an actual experience of 20 years in running boilers, and was familiar with the tensile strength entering into the construction of boilers, testified

that the safe working pressure was 103 pounds and a fraction. This witness also made the same examination that plaintiff's expert witness Mr. Brobst made after the explosion, and testified that, in his judgment, "the boiler did not explode from overpressure." Mr. Peterson, the engineer and boiler maker who repaired it, as hereinafter stated, testified that the boiler "was capable of withstanding a safe working steam pressure of between 90 and 100 pounds, and that it would be safe at that pressure for several years." He also testified that he had made a computation, according to the rules, and ascertained the safe working pressure to be 103 4-10 pounds.

The only other testimony which could be considered as having any bearing upon the point is that of plaintiff's witness Brobst, who manufactured the boiler. He testified that the boiler was a 75 horse-power boiler, and when built he thought it was for 75 pounds of steam, which he considered a safe working pressure.

Mr. Peterson testified:

"After repairing the boiler, and before turning it over to Mr. Hodges, I pronounced it safe, and, according to my experience, it would be safe to work every day at between 90 and 100 pounds, and I so reported to Mr. Hodges."

This testimony of Mr. Peterson is undisputed. After repairing the boiler and applying the hammer test, Mr. Peterson applied the hydrostatic test of 125 pounds pressure. The experts agree that the hydrostatic test is one of the surest and best.

As to the working of the boiler on the day of the accident, Mr. Raynourd testified:

"When regulating the valve by the two levers and weights, I observed the steam-gauge register 75, 80, and 90 pounds, respectively, according to the adjustment of the weights at various distances from the fulcrum. It blew off at 90 pounds, according to the steam-gauge when so regulated, and remained in that condition all the time up to the accident. * * * The valve operated freely that day, and blew off at a pressure of 90 pounds the middle of the forenoon."

It conclusively appears from the record now presented to us that the defendant had performed its full duty towards its employés in furnishing a safe boiler, a competent engineer, inspectors, repairers, and testers of the boiler; that after being informed by the repairer, a man thoroughly competent and experienced, that it was safe to work under a pressure of 90 to 100 pounds, the safety valve was set to blow off at the lowest limit of safety, rather than the highest; that the boiler actually exploded at or about the pressure of 85 pounds; that, for several years prior to its use by defendant, the safety valve was placed at a pressure of 105 pounds, and that immediately upon its showing signs of leaking, a few months before the accident, the defendant caused it to be properly repaired and tested, and that it had shown no signs of weakness prior to the explosion.   The sole basis for any liability is that the defendant used this engine at too high a pressure, and that it should have been known that its use under such a pressure was dangerous.

Unless it was negligent to run this engine under a pressure of 85 pounds, the defendant is not liable.   Was not the defendant justified in relying upon the statements of the engineer who repaired and tested the boiler, upon its previous record, and upon the opinion of the competent engineer whom it had placed in charge?   If it was not so justified, then it becomes the absolute insurer of the safety of the boiler.   This court, speaking through my Brother MONTGOMERY, in *Woods* v. *Railway Co.*, 108 Mich. 396 (66 N. W. 328), defined what a reasonable inspection was, in a case where a locomotive boiler had exploded.   The instruction by the trial court, which was held to state the correct rule, is as follows:

"If you believe from the evidence given you in the case that these tests were made—actually made—by the defendant; that is, that this engine was overhauled and inspected, and subjected to the hydrostatic test, by competent men, within two years of the time of the explosion, and also thoroughly and carefully tested by the hammer test, by

competent testers, within 30 days from the time of the explosion,—I say, if you find these tests were made, then defendant has done all that it can be asked to do, and would not be guilty of negligence, and ought not to be held in this action."

Applying that rule to this case, the defendant had done all the law required. To hold it liable would be to say that it was negligent in running the engine at a pressure fixed by competent engineers as safe, and found by an experience of several years to be safe. Where a railway company purchased a locomotive from a firm of locomotive builders of recognized high standing and reliability, and had made a trial trip as·a test, and the locomotive had operated safely in active work for a distance of over 7,000 miles, during a period of five or six months, it was held that the company had complied with the full measure of duty. *Clyde* v. *Railroad Co.*, 65 Fed. 482. In a case where the facts were much stronger for the plaintiff than in this case, the supreme court of Illinois held that there was no liability. *Indianapolis, etc., R. Co.* v. *Toy*, 91 Ill. 474 (33 Am. Rep. 57). See *Smoot* v. *Railway Co.*, 67 Ala. 13. Where a boiler exploded and recovery was sought by an employé upon the ground that the boiler was defective and unfit for use, and that such defect and unfitness were known, or by reasonable care might have been known, to the servants of the company whose duty it was to keep such machinery in repair, it was held incumbent upon the plaintiff to show that the boiler exploded by reason of the particular defects insisted on by the plaintiff. *Texas, etc., R. Co.* v. *Barrett*, 166 U. S. 617 (17 Sup. Ct. 707). See, also, *Gohen* v. *Railway Co.*, Fed. Cas. No. 5,507. Where an employé received an injury caused by an explosion of the crown sheet of a boiler, and a week before the accident a careful examination was made and no weakness discovered, and the boiler was afterwards subjected to a test of 145 pounds pressure, —its proximate capacity,— and resisted that pressure, and subsequently exploded under a pressure of only 110

pounds, it was held that there was not sufficient evidence
of defendant's negligence to be submitted to the jury.
*Racine* v. *Railroad Co.*, 70 Hun, 453 (24 N. Y. Supp.
388). See, also, *Ballard* v.*Manufacturing Co.*, 51 Hun,
188 (4 N. Y. Supp. 940); *Reiss* v. *Steam Co.*, 128 N. Y.
103 (28 N. E. 24). Where a party, in the face of warning
and of an apparent defect, chose to rely upon the assur-
ance of the manufacturer, he is not excused from liability.
*Spencer* v. *Campbell*, 9 Watts & S. 32.

The engineers employed to control and examine this
boiler were daily about the engine. The officers of the
defendant, who were its *alter egos*, were also frequently
around it. That they considered it safe is apparent, else
they would not have risked their own lives in its vicinity.
A due regard for their own lives and property would
naturally lead them to the exercise of due care. No one
had even intimated to defendant that there was any danger
to be apprehended from a pressure of 90 pounds or less.

This disposal of the case renders it unnecessary to discuss
the question of the alleged negligence in placing a second
lever upon the safety valve, because the boiler exploded
under a pressure lower than that at which it was set to
blow off.

In view of a new trial, it is proper to say that we think
the court erred in charging the jury as follows:

"And if an employé is injured by reason of defective or
unsuitable machinery, the master will be liable in damages,
unless he can clearly show due care and caution in the
providing and keeping of the same. * * * It was the
duty of the defendant, first, to furnish a safe and suitable
boiler, and then to keep it in that condition. * * * In
the use of this boiler, the defendant was bound to keep
within the limits of safety."

These portions of the charge imposed a greater degree
of care than the law requires. Reasonable care is all that
the law requires. This reasonableness is to be measured,
of course, by the dangers incident to the business and the
machinery in use.

Judgment reversed, and new trial ordered.

The other Justices concurred.