### GREAT AMERICAN INSURANCE COMPANY *v.* MICHIGAN CONSOLIDATED GAS COMPANY.

1. NEGLIGENCE—GAS EXPLOSION—EXPERT WITNESS—OPINION TESTIMONY.
   Trial court did not commit error in allowing expert witness to testify as to his theory of cause of explosion in gas-burning combination space heater and air-conditioner unit where factual evidence was sufficient to establish that explosion preceded fire rather than being caused by fire and where such testimony was founded on the expertness of witness.

2. SAME—GAS EXPLOSION—EXPERT WITNESS—OPINION TESTIMONY— MATTERS BEYOND COMMON KNOWLEDGE.
   Testimony of expert witness stating his opinion as to the cause of an explosion in a gas heater was admissible since facts surrounding ignition of gas are beyond common knowledge or the experience of ordinary people.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 31 Am Jur 2d, Expert and Opinion Evidence § 146.
   38 Am Jur 2d, Gas and Oil § 333.
[3] 29 Am Jur 2d, Evidence §§ 493, 497.
[4] 31 Am Jur 2d, Expert and Opinion Evidence §§ 26, 33, 36.
[5] 29 Am Jur 2d, Evidence §§ 597, 600.
[6, 7] 53 Am Jur, Trial § 967.
   39 Am Jur, New Trial §§ 150, 151.
[8] 22 Am Jur 2d, Damages § 179.

3. EVIDENCE—WITNESSES—PHYSICAL EVIDENCE—HEARSAY.

Trial court properly sustained objection to testimony of a witness as to location where a wrench was found where the witness had not found the wrench and his knowledge of location was based only upon what an unidentified person told him.

4. SAME—WITNESSES—PHYSICAL EVIDENCE—FOUNDATION FOR TESTIMONY.

Trial judge properly sustained objection to question by defense counsel to witness concerning cause of marks on brass gas fitting where no foundation had been laid establishing the witness as an expert with respect to the possible origins of such marks.

5. SAME—ADMISSIONS.

Refusal of trial court to admit into evidence, as admissions, statements made by two witnesses to fire department officials was not error where the statement of one was in substance what he testified to at trial, varying only as to time, and was not offered for impeachment, and where the other's purported ownership or relatedness to one of the plaintiffs' subrogors did not appear in the record and his authority to speak for a subrogor was never established.

6. TRIAL—EXPERT WITNESSES—DISCOVERY—SURPRISE.

Testimony by plaintiffs' investigator and expert witness as to his theory that the cause of a gas explosion was that a safety shutoff was stuck in an open position by corrosion, after trial court's limitation of scope of defendant's pretrial discovery deposition to factual testimony, did not result in such surprise to defense at trial as would warrant a new trial where defense was permitted full examination of the shutoff unit before trial, had the opportunity to elicit plaintiffs' theory on factual examination in the deposition of the expert and the defense produced one expert witness in rebuttal and made no showing of attempt to secure another more expert witness in rebuttal nor request for continuance to secure such a witness.

7. SAME—EXPERT WITNESS—SURPRISE—FAILURE TO CLAIM AT TRIAL.

Defendant was not entitled to be granted a new trial where it failed to claim surprise at testimony of plaintiffs' expert witness at trial since such a new trial would in effect allow defendant a second chance to defeat the cause of action after it apparently was satisfied to risk liability by proceeding as it did to trial.

8. DAMAGES—INTEREST—DATE OF FILING OF ACTION.

Trial judge properly entered judgment awarding as damages interest from the date of filing of the action until the date of judgment where at pretrial the pleadings were amended, without objection by defense, to include a claim for interest and defense agreed immediately following trial to computation of interest by trial judge.

Appeal from Wayne, Dingeman (Harry J.), J. Submitted Division 1 April 8, 1968, at Detroit. (Docket No. 3,430.) Decided September 25, 196°. Application for leave to appeal dismissed on stipulation November 14, 1968.

Complaint by Great American Insurance Company, a New York corporation, and 14 other insurers, with Citizens Insurance Company of New Jersey as intervening plaintiff, against Michigan Consolidated Gas Company, a Michigan corporation, for property damage suffered in explosion and fire. Verdict and judgment for plaintiffs. Defendants appeal. Affirmed.

*Johnson, Campbell & Moesta,* for plaintiffs.

*Dyer, Meek, Ruegsegger & Bullard,* for defendant.

HOLBROOK, P. J. This action was brought by 16 insurance company plaintiffs, the subrogees of 28 insureds, against defendant, Michigan Consolidated Gas Company, to recover damages arising out of an "explosion and fire" occurring in a two-story commercial building at 19489–19491 Livernois avenue, Detroit, Michigan, on December 15, 1960. A jury trial was held and judgment was entered on a verdict in favor of plaintiffs in the amount of $106,386.52. Defendant's motion for new trial was denied by the trial court.

The premises at which the accident occurred were occupied by 2 subrogor corporations, the Executive Suite and S. Ely, Inc. A gas-burning combination space heater and air-conditioning unit on the second floor of the building was serviced and checked by defendant's serviceman and employee, James McTigue, during the morning of the day of the accident following a "no heat" complaint. Plaintiff's answers to defendant's pre-trial interrogatories state specifically several acts of alleged negligence by defendant's serviceman in servicing this unit:

"(a) Failing to properly test and inspect the safety shut-off valve.

"(b) Failing to warn customer of the dangerous condition of the safety shut-off valve which he knew, or in the exercise of care should have known, was in a dangerous and defective condition.

"(c) Failing to replace the safety shut-off valve.

"(d) Leaving or causing the safety shut-off valve to be left in an inoperative condition.

"(e) Failing to properly re-assemble the gas furnace controls and leaving said gas furnace in an unsafe and defective condition.

"(f) Failing to properly test for gas leaks.

"(g) Failing to perform the work in a proper and workmanlike manner; and failing to exercise that degree of care commensurate with the dangers involved."

Additional facts, as relevant, will be set out in considering the issues raised on appeal by defendant.

1. *Did the trial court commit error in permitting plaintiffs' expert witness to express his opinion as to how a gas explosion could have occurred?*

This issue arises out of the different theories advanced at trial by defendant and plaintiffs as to the cause of the damages at the insured premises.

Plaintiffs claimed the fire resulted from a gas explosion while defendant asserted an explosion resulted from the fire.   Defendant claims that the trial court committed error in permitting plaintiffs' expert witness, James E. Benedict, to express a theory as to how a gas explosion could have occurred because there was no factual evidence that an explosion preceded the fire.   The following testimony presents sufficient facts for supporting the expert opinion testimony, permitted by GCR 1963, 605,[1] stating a theory as to the cause of the explosion.

[*Direct examination of witness Ely S. Ely*]

"*Q.* Will you tell us what happened at or around or shortly after 8 p.m. that evening?

"*A.* Well, we were working in the store—in the back of the store.   We were three people working. And at a certain time, we smelled something.   At that time, the back door was open so we thought it may be some odor from the alley.   But it was persisting and finally we thought it was gas and we were able to trace it.   It was coming right underneath a partition that was between the two stores. And then—

"*Q.* What did you do then, when you determined it was gas?

"*A.* I called the gas company.

\* \* \*

---

[1] GCR 1963, 605 reads as follows:

"Questions calling for the opinion of an expert witness need not be hypothetical in form unless the judge, in his discretion, so requires. The witness may state his opinion and reasons therefor without first specifying data on which it is based, but upon cross-examination, he may be required to specify such data.   The judge, in his discretion, may require that a witness, before testifying in terms of opinion or inference, be examined first concerning the data upon which the opinion or inference is founded.   Testimony of expert witness in the form of opinions or inferences otherwise admissible is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."   See *Cree Coach Company* v. *Wolverine Insurance Company* (1962), 366 Mich 449.

"*Q.* Did the odor of gas continue? Did you continue to smell gas?

"*A.* Yes, it did, and it was becoming more and more. There was more of that odor.

"*Q.* Did you call the gas company more than once that evening?

"*A.* Back in my mind, I think yes, I did. But I'm not sure.

\* \* \*

"*Q.* What was the first notice that you had of this explosion? Would you tell us what happened?

"*A.* Well, while I was nailing, the explosion occurred and everything went flying in the place. And that's the notice I had.

\* \* \*

"*Q.* So we understand your testimony, do I understand that first you heard this explosion and felt it?

"*A.* Yes.

"*Q.* Did you see any flame or fire at that time?

"*A.* At that time, no.

"*Q.* Do I understand this explosion blew out your front window?

"*A.* Yes.

\* \* \*

"*Q.* Did you at that time see any flame or fire?

"*A.* No. I ran to the back. When people started to hollering there was a fire, I ran to the back. I had there a valuable painting I wanted to take out. And at that time, the far corner—I mean from the ceiling down—it was beginning to burn. So then I thought of calling the fire department. I hadn't thought of it at all.

"*Q.* Did you then call the fire department?

"*A.* Yes, I did.

\* \* \*

[*Direct examination of witness Irving Greenstone*]

"*Q.* Did you have occasion to be in your store on December 15, 1960, shortly after 9 p.m.?

"*A.* I was.

"*Q.* Will you tell the jury what you saw at that time on that day?

"*A.* I saw a flash of fire from the second story of the building and then like a sheet of glass, which evidently were the windows, that covered about half of Livernois.

"*Q.* Was there any sound accompanying that, sir?

"*A.* There was a very loud explosion sound.

"*Q.* Where were you at the time you saw this?

"*A.* I happened to be standing in the front of the store looking out the front window.

"*Q.* The building that you saw the sheet of flame or saw the windows come out of, was that the building occupied by the Executive Suite?

"*A.* Yes.

"*Q.* Was that the first or second floor of the building that you observed?

"*A.* Second floor.

"*Q.* Following that, did you immediately observe any other fire in any portion of the building?

"*A.* Just on the second floor."

Benedict's theory of how the accident could have occurred was based on adequate factual evidence from his investigating examination of the controls of the unit serviced by defendant's serviceman, located in the center of the burned-out area of the premises, and more than common knowledge of those areas, from which the theory was formulated. *Beunk* v. *Valley City Desk Co.* (1901), 128 Mich 562. His theory included inferences based upon facts; however, we do not find this to be inference based upon inference as argued by defendant. The testimony of plaintiffs' expert witness stating an opinion as to the possible cause of the accident was admissible because it dealt with facts ordinarily beyond the common knowledge or experience of ordinary people. See 88 ALR2d 230, 280:

"Opinion testimony of an expert or skilled witness as to the cause or origin of a fire resulting from the

ignition of gas or gasoline has generally been found admissible in evidence, for the reason apparently that the facts surrounding the ignition of gas or gasoline are ordinarily beyond the common knowledge or experience of ordinary people and thus testimony of an expert or skilled witness on the subject would aid the jury in reaching a proper conclusion."

2. *Did the trial court commit error with reference to the admissibility of a wrench and a brass fitting?*

Defendant sought to introduce in evidence the testimony of William O'Brien, an officer of the arson bureau of the Detroit fire department, as to the unusual location of a wrench found at the insured premises. Plaintiffs' counsel objected. A special record was made, at the conclusion of which the trial court stated:

"Well, it appears, gentlemen, that some of his testimony might be properly introduced, depending upon the manner in which it is sought to be elicited from the witness. We have established that the witness did not find the wrench and his testimony with respect to where it came from appears to be based upon what somebody, unidentified, told him. I would sustain an objection to that."

The ruling of the trial court is supported by the record and we find no error in the court's sustaining plaintiffs' objection.

Defendant's exhibit no. 8, a brass fitting, was admitted in evidence. When defendant's counsel asked witness O'Brien what four marks on the fitting indicated to him, an objection was made by plaintiffs' counsel raising in issue the qualifications of the witness to answer the question. In the absence of the jury the following transpired:

"*The Court:* May I see it [*defendant's exhibit no. 8*] again?

"I assume this witness is going to be asked to testify that the four marks on this fitting are pipe wrench marks. Is that right?

"*Mr. Ruegsegger:* In his opinion, yes.

"*The Court:* Unless you can establish some foundation for his expertise in that subject, I won't allow it. Those don't look like pipe wrench marks to me. And if we stand on equal footing, I certainly wouldn't classify myself as an expert.

"First of all, they are not even regular. I have never seen a pipe wrench that didn't have regular markings on its jaws.

"Where is that one you've got here? Does that one's jaws have anything but parallel edges on it?

"*Mr. Johnson:* There is a second objection too, your Honor.

"*The Court:* In addition, holding a pipe wrench that way wouldn't move this thing. That's not on the nut; that's on the housing, is it not?

"There's got to be a lot more background before I will permit that answer. If you can establish it by proper questioning, that's fine. But so far, there is no background for the answer you wish, in my opinion."

A recess was then taken after which defendant's counsel waived further examination of witness O'Brien. We fail to find any error.

3. *Did the trial court commit error by refusing to admit into evidence testimony of investigators from the arson bureau of the Detroit fire department of statements made to them by Ely S. Ely and Julius Fantich on the night of the fire?*

Defendant attempted to place in evidence statements made to arson bureau investigators Charles L. Craft and William O'Brien by Ely (the odor of gas was noticed 30 minutes before the explosion shortly before 9:17 p.m.) and Julius Fantich (there was no odor of gas when he left the building about

9:00 p.m.) as admissions. The trial court sustained plaintiffs' objection to these statements being put in evidence.

With reference to Ely's statements: Ely on direct examination testified he noticed the odor of gas between 8:10 and 8:20 p.m. Defendant attempted to introduce in evidence, as an admission, Ely's prior statement to Craft and O'Brien that he had noticed the odor of gas 30 minutes before the explosion occurred. If admitted as an admission, Ely's prior statement would constitute substantive evidence. In sustaining plaintiff's objection, the trial court observed that Ely's prior statement did not contain any admissions and was in substance what Ely had testified to at trial "except perhaps for some variances of exact time." Defendant's counsel replied to this by stating as follows:

"As to Ely's testimony, I wasn't too concerned with that except that he was very positive that he had called the gas company—had smelled gas and called the gas company—between 8:10 and 8:20. Now, he told the investigators immediately after that it wasn't until a quarter of nine."

Repetition by the witness of Ely's statement was not sought to impeach his credibility and, therefore, the testimony was not admissible. The trial court's ruling under the circumstances was proper.

With reference to Fantich's statements: Fantich was never produced, although listed as a witness for defendant.[2] His purported ownership or relatedness

---

[2] The following took place out of the presence of the jury:

*"Mr. Johnson [counsel for plaintiffs]:* It seems to me, your Honor, if they are admissible as of an opposite party, they are admissible as being against interests. Also, it seems to me that Mr. Fantich's name was listed as a witness for the defense in this case. If it is, I would suspect this testimony should be withheld until after Mr. Fantich testifies.

*"The Court:* Is that so, Mr. Ruegsegger [counsel for defendant]? Is Mr. Fantich one of your witnesses?

*"Mr. Ruegsegger:* Well, I have listed him as one of my witnesses."

to one of the subrogors does not appear in the evidence. At no time was the authority or capacity of Fantich to speak on behalf of the particular subrogor corporation established. Until this was done, his statements could not be held binding on the subrogor corporation. *Holtz* v. *L. J. Beal & Son, Inc.* (1954), 339 Mich 235.

4. *Where the trial court granted plaintiffs' motion to limit the scope of pretrial discovery deposition of plaintiffs' expert witness to factual testimony, did this result in prejudice to the defendant's case because defendant was surprised at trial when plaintiffs' expert testified that the control unit's "safety shut-off valve was stuck in the open position due to corrosion around the drum of this safety valve"?*

The trial court granted plaintiffs' motion to limit the scope of a pretrial discovery deposition to be taken of plaintiffs' investigator and expert witness, James E. Benedict, by an order which reads as follows:

"It is hereby ordered that the deposition of James Benedict be limited to factual testimony and that defendant may not inquire into or compel James Benedict to testify to any opinions or conclusions formed by him."

It is defendant's contention that as a result of the order limiting the discovery deposition to factual evidence, prejudice resulted to defendant's case because defendant was surprised at trial when plaintiffs' expert testified that the control unit's "safety shut-off valve was stuck in the open position due to corrosion around the drum of this safety valve." Further facts are here necessary: shortly after the accident the controls of the unit serviced by defendant's serviceman, located in the middle of the burned-out area of the premises, were removed. They came into the possession of Benedict, who disassembled

and examined them at his place of business.   The following factual information was obtained by defendant in the discovery deposition of Benedict:

"*Q.* Will you tell us what this investigation consisted of?

"*A.* Dismantling the controls, the main solenoid gas valve, the combination pressure-regulator and safety shutoff valve, and the pilot, the thermocouple, and the pilot regulator in the shutoff valve and the main shutoff gas cock.

"*Q.* Did you discover any malfunction of any of those?

"*A.* Yes, sir.

"*Q.* And what malfunction?

"*A.* We found the safety shutoff valve in the open position.

"*Q.* Anything else?

"*A.* No.   Everything else seemed to be functional."

At a date after the taking of Benedict's discovery deposition but before trial, defense counsel, accompanied by Don Gronedal, Verne Gronedal and a photographer, visited Benedict's office where the controls were examined in their disassembled condition. During defense counsel's cross-examination of Benedict at trial, the following was elicited:

"*Q.* Now, you recall also, do you not, that sometime later this year, after your deposition was taken and pursuant to the order of the court, we were allowed to examine these controls, all of these that are here in court now, out at your place of business?

"*A.* Yes, sir.

\* \* \*

"*Q.* The testimony you gave on direct examination that the shutoff valve was, and I hope I use your language, stuck in the open position as a result of corrosion.   As you stated, that cannot be seen with this valve assembled the way it is here.

"*A.* No, sir.

"*Q.* Will you be able, before you leave the stand or during a recess or something, to disassemble this so that you can show us this valve stuck in the open position as a result of corrosion?

"*A.* No, sir.

"*Q.* You can't do it?

"*A.* I can disassemble the valve but I can't show you the corrosion.

"*Q.* Why is that?

"*A.* It's been handled so much it's gone.

\* \* \*

"*Q.* Where did all that handling come from, then?

"*A.* Tearing it apart, complete disassembly, trying the valve, sliding the brass cylinder in and out to see whether it would work or not. It doesn't take much to make one of those stick.

"*Q.* Then this so-called corrosion that you talk about, then, was dissipated by you or in connection with your examination and analysis of the valve. Is that right?

"*A.* I believe when you were out at my office I showed you some slight evidence of where the corrosion was. There was still a film left on it.

"*Q.* I'm just a lawyer. Are you sure you didn't show it to one of the Gronedals rather than to me?

"*A.* No.

"*Q.* You think you showed it to somebody?

"*A.* Well, there were three of you and the photographer and I know it was indicated."

*Defendant first made a claim of surprise and resulting prejudice as to plaintiffs' theory of corrosion of the valve in its motion for new trial.* Our review of the entire record fails to find evidence supporting defendant's post-trial claim of being totally and completely surprised at time of trial with resulting prejudice for the following reasons:

(1) Defendant was permitted full examination of the controls prior to trial.

(2) In taking the discovery deposition of Benedict, after receiving Benedict's statement that the safety shutoff valve was found in an open position, a question could have been asked as to whether there was any factual evidence which caused or might have caused this abnormal condition present in the control unit. Such a question should have elicited a response indicating corrosion of the valve drum.

(3) Plaintiffs' expert witness testified under oath that he indicated the presence of corrosion to defense counsel or another of defendant's representatives present at the time of examination; defendant did not attempt in any way to rebut this testimony when examining Verne Gronedal, one of the persons present at the time of examination.

(4) Defendant's counsel did not object to plaintiffs' expert witness's testimony of corrosion as setting forth plaintiffs' claim of negligence.

(5) Defense counsel thoroughly cross-examined Benedict at trial as to the presence of the corrosion and its effects.

(6) On October 19 (Wednesday), 1966, Benedict stated "we found that the safety shutoff valve was stuck in the open position due to corrosion around the drum of this safety valve." Five days later, on October 24 (Monday), 1966, defendant called to the stand its own expert John O. Mandley, a corrosion engineer.

(7) Defendant's claim that it was prejudiced because it did not have time to call in outside expert witnesses cannot be accepted; there is no showing in the record that defendant attempted to obtain such a witness in the interim period, that it was dissatisfied with the testimony of its own corrosion expert, or that other corrosion experts who might have been produced would be better qualified. *Chapin* v. *Cullis* (1941), 299 Mich 101; *Graeger* v. *Hager* (1936), 275 Mich 363.

In 66 CJS, New Trial, § 99(g), pp 287, 288, we find:

"As a general rule, *a party asking a new trial on the ground of surprise at evidence must have indicated his surprise to the court at the time, and should not have proceeded with the trial and speculated on the chances of a favorable verdict, but should have asked for delay or a continuance to enable him to overcome the effect of such evidence or for other relief to which he might be entitled.* However, the rule requiring a manifestation of surprise and application for a continuance is not inflexible, and yields to the demands of justice. Thus a new trial may be allowed for surprise at evidence, although no delay was asked for, if movant, although ordinarily diligent in preparing his case, then knew of no other evidence to refute evidence by which he was surprised." (Emphasis supplied.)

Defendant did not claim surprise at the time the evidence was presented at the trial. It is clear that defendant cannot qualify for a new trial because of surprise based on the claim that it knew of no other evidence to refute that which caused the surprise, for it offered an expert witness for that very purpose at the trial 5 days after the questioned evidence was presented. To grant defendant a new trial for the reasons proffered would in effect allow defendant to have a second chance to defeat the cause of action after it apparently was satisfied to risk liability by proceeding as it did with trial. *Dusendang* v. *Thompson* (1966), 2 Mich App 526, 534.

5. *Did the trial court commit error in entering judgment to include interest from the date suit was commenced until the date judgment was rendered?*

This final question concerns interest allowed as damages, as distinct from statutory interest. In the recent case of *Banish* v. *City of Hamtramck* (1968), 9 Mich App 381, 393, 394, this Court stated:

"We note that under CLS 1961, § 600.6013, as amended by PA 1965, No 240 (Stat Ann 1965 Cum Supp § 27A.6013), *interest on a judgment* may now be recovered from the date the complaint is filed. Our Court has held that the amended statute does not apply to complaints filed prior to the amendment's effective date, even though the judgment itself be entered subsequent to the effective date. *Swift* v. *Dodson* (1967), 6 Mich App 480. In *Swift,* our Court carefully noted the distinction between interest on a judgment, which is purely statutory, and interest included as an element of damage. We are now concerned with the latter." (Emphasis supplied.)

The pretrial summary herein signed by the trial judge states that "the pleadings are amended to include a claim for interest from the date of institution of the suit to entry of judgment of five per cent per annum." This constituted a claim for interest as a part of the damages and not a claim for statutory interest.

Following trial, plaintiffs' counsel made a motion for entry of judgment. The following occurred at the hearing on the motion.

"*Mr. Moesta [plaintiffs' counsel]:* If it please the court, this is a motion for entry of judgment in accordance with the jury verdict rendered before the court on October 27, 1966. We have also asked the court here to determine the amount of interest to which plaintiffs are entitled. It was my understanding when we left court on October 27, that we had agreed to interest in the amount of $16,234.82. Mr. Ruegsegger now takes the position that we are not entitled to any interest. * * *

"Our position is, first of all, that we are entitled to this interest in the sum of $16,234.82 for the reason that, first of all, this was agreed to by the defendant's counsel. The court will recall at the

time of pretrial, we moved to amend our complaint to include it and this was done with no objection by the defendant. When we went over the requests to charge of the parties, again the question was brought up as to how the interest would be handled; whether it would be computed by the court or by the jury; and both sides agreed that the court would compute it. After the verdict was entered, we did compute it and Mr. Ruegsegger agreed to it on the record. And we claim he is now estopped to come in and claim they don't owe it. * * *

"*Mr. Ruegsegger* [*defendant's counsel*]: If the court please, I would like to make my position clear in this matter. * * *

"With reference to the amount of the judgment and the matter of interest, your Honor will recall that prior to the submission of this case to the jury and when we were discussing requests to charge, the matter of interest came up and I said that I felt that that was a matter that the court ought to determine and that a charge should not be given to the jury to allow them to determine interest. And I think as a result of that—in any event, no charge was given to the jury.

"When the jury came in, counsel immediately produced a proposed judgment and wanted the court to enter it forthwith, which judgment entry in effect provided that a verdict having been returned in x amount, *judgment is hereby entered in that amount plus the amount of interest that we mathematically computed.* And the last entry in the judgment was that interest at 5 per cent would run on this total amount which I took the position then that that amounted to interest being chargeable from that date upon interest." (Emphasis supplied.)

The agreement referred to by plaintiffs' and defendant's counsel appears in trial transcript as follows:

"*The Court:* The record should indicate that interest has been computed at 5 per cent from October

8, 1963 until this date; and it amounts to $16,234.82.
   "Gentlemen, do you agree with the mathematics?
   "*Mr. Ruegsegger:* I do.
   "*Mr. Moesta:* Yes, your Honor.
   "*The Court:* Very well. You will prepare and
submit either an approved order, or in lieu of that,
notice your order for presentment."

The trial court properly included in the judgment
interest in the amount of $16,234.82, as agreed to by
counsel for plaintiffs and defendant.

Affirmed. Costs to appellees.

LEVIN and PRATT, JJ., concurred.