EBERTS *v.* MT. CLEMENS SUGAR CO.

1. MASTER AND SERVANT—DECLARATION—PLEADING—EXPLOSIONS —BOILERS—SAFE PLACE.

    Plaintiff's declaration, alleging that he was injured, while he was in the employ of defendant, from an explosion of its boiler; that for a period of ten years the boiler had not been properly inspected; that excessive heat had been applied to the plates of the boiler, causing them to bulge and strain; that the boiler had become unsafe from use and overheating; that it was defendant's duty not to subject the boilers in its factory to excessive heat; and that the duty rested on defendant to inspect, etc., was not demurrable for the reason that the declaration did not allege that the boiler was imperfectly constructed or of improper material.

    182 Mich.—29.

2. SAME—INSPECTION—NONDELEGABLE DUTIES.

The duty to inspect a boiler or other machinery cannot be delegated by the master so as to escape liability by virtue of the fellow-servant rule.

3. SAME—CONTRIBUTORY NEGLIGENCE—DECLARATION.

Where the declaration averred that the defects in the boiler were unknown to plaintiff, and that he exercised due care and caution, the demurrer of defendant, which set up the objection that the plaintiff was shown to be chargeable with contributory negligence, was properly overruled.

4. JURY—CHALLENGE TO ARRAY—JURY COMMISSION.

Under Act No. 367, Local Acts 1895, creating a board of jury commissioners for the county of Macomb, providing for an annual meeting on the first Monday of May in each year, and that the panel for the jury shall be selected from the assessment roll of the preceding year, the trial court was right in overruling a challenge to the array of jurors, charging that the commissioners used the assessment rolls for another year, and did not select the names from the roll of the preceding year, when the evidence showed that the assessment rolls for the year in question were not completed, and the jury commissioners had the rolls of the preceding year, as required by the statute.

5. SAME.

No sufficient ground of challenge was proved, because defendant charged that the commissioners drew only nine names of jurors from one township instead of ten from each, as provided by the local act affecting Macomb county, where its attorneys did not exercise any of its peremptory challenges and from the township which defendant referred to only two jurors were drawn on the panel.

6. MASTER AND SERVANT—SAFE PLACE—BOILERS—INSPECTION.

And evidence supporting the averments of plaintiff's declaration as to overheating the rear stay plates and lossening the bolts, also, as to failure to inspect the boiler, presented an issue for the jury.

7. TRIAL—ARGUMENT OF COUNSEL.

Unfair comments of plaintiff's attorney, in the argument of a personal injury case, to the effect that defendant's witnesses had never seen a boiler, etc., were cured by the statement of the court that the jury would remember the evidence, and by his instructions that it would be their duty to recall and be governed by the evidence.

8. APPEAL AND ERROR—REVIEW—EXCEPTIONS.

In order to review, on error, prejudicial statements or argument of attorneys, it is essential to secure a ruling of the court by bringing the matter to the attention of the court, not simply by taking exceptions.

9. MASTER AND SERVANT—TRIAL—INSTRUCTIONS.

Nor did the trial court err in charging the jury that the plaintiff's right to recover depended largely on two essential facts: (1) Had the stay sheet and connecting stay bolts of the boiler become so defective as to make the boiler more dangerous than one in reasonably good repair? (2) If so, did the servant in charge have actual or constructive notice of the condition?

10. SAME—EVIDENCE—PERMANENCY OF INJURIES.

Also, it was proper to charge that if the jury found plaintiff's injuries to be permanent, they should award to him a sufficient sum of money to compensate him for loss of the ability to earn a livelihood, not exceeding the period of his expectancy; plaintiff's proofs tending to show that his injuries were of a permanent character.

11. TRIAL—SPECIAL QUESTIONS—CONCLUSIVENESS.

There was no reversible error, on the trial of a case arising out of the explosion of defendant's boiler, in declining to submit to the jury defendant's fourth special question whether the first break in the boiler occurred at a point identified in defendant's exhibit, *i. e.*, in the combustion chamber of the boiler, where it was very doubtful if the affirmative answer to the question would have been conclusive.

12. APPEAL AND ERROR—ASSIGNMENT OF ERROR—GENERAL NATURE—SAVING QUESTIONS FOR REVIEW—NEW TRIAL.

An assignment of error that the court erred in denying defendant's motion for a new trial, which contained the objction that the court erred in failing to charge as requested in defendant's requests, was too general, where the requested instructions covered six pages of the record.

13. SAME—WEIGHT OF EVIDENCE.

An assignment of error that the verdict was contrary to the evidence did not raise the point that the verdict was contrary to the overwhelming weight of the evidence.

14. SAME—EVIDENCE.

*Held*, that the testimony warranted a verdict for plaintiff.

15. EVIDENCE—FORMER VERDICT.

    No error was presented by an assignment that the court erred in ruling out the records in a previous action for personal injuries in which plaintiff had recovered a judgment for injuries received in a railway accident, in no way connected, so far as the evidence disclosed, with the injuries for which he claimed damages.

Error to Macomb; Tappan, J. Submitted April 13, 1914. (Docket No. 28.)   Decided October 2, 1914.

Case by Charles Eberts against the Mt. Clemens Sugar Company for personal injuries. Judgment for plaintiff.   Defendant brings error.   Affirmed.

*Thomas A. E. Weadock,* for appellant.

*John A. Weeks,* for appellee.

STONE, J. This is an action for damages on account of personal injuries sustained by the plaintiff on the occasion of the explosion or failure of a steam boiler in defendant's sugar factory on November 1, 1911. The declaration alleges that the defendant was at the time stated the owner, occupant, and operator of a factory for the purpose of manufacturing sugar from beets; that in its said factory it maintained and operated a system of steam boilers, constructed of iron and steel, 11 in number, for the purpose of generating steam to operate the machinery and do the other necessary work in such manufacture, which said steam boilers had been used by said defendant for a period of about 10 years; that at the time aforesaid the plaintiff was in the employ of said defendant; that his duty was to unload coal from cars situated on a railroad track adjacent to the place or room in said factory where such boilers were situated, by shoveling such coal from said cars through an open window and space directly into said boiler room, the place where plaintiff was engaged in said work being a distance

of about 20 feet from one of said boilers, known and
designated as boiler No. 2; that on the occasion of
the injury complained of the plaintiff was engaged in
such work of unloading coal, and was in the exercise
of due care and caution, and was without fault or neg-
ligence on his part.  It is alleged that it then and there
became and was the duty of said defendant to use rea-
sonable care to provide a safe place in which the plain-
tiff was to perform such work, and to provide, keep,
and maintain each of its said systems of boilers, and
particularly said boiler No. 2, in a reasonably safe
and proper condition, so that the same would not fail,
burst, or explode, because of the defective condition
thereof, thereinafter mentioned, and thereby injure
plaintiff while engaged in such work; that it became
and was the duty of said defendant not to so over-
work or overtax said boilers, or any of them, beyond
their capacity, that the same would fail, explode or
burst, and thus injure its employees or said plaintiff;
that it was defendant's duty not to overheat or over-
fire the said boilers, and particularly boiler No. 2, so
that the same would become strained beyond their
capacity, and the parts thereof, particularly the parts
of boiler No. 2, known as the rear stay plate thereof,
become burnt, bulged, strained, and thereby weak-
ened; that it was the duty of defendant not to subject
said boilers to an excessive heat and excessive pres-
sure, so that the steel plates and steel bolts constitut-
ing the parts thereof would become burnt by exces-
sive heat, and strained, bulged, and weakened, so that
such boilers, or the parts thereof, would fail, explode,
or burst, and thus injure the plaintiff and other em-
ployees of the defendant; that it then and there be-
came and was the duty of the defendant to exercise
great care and caution to ascertain whether the said
boilers, or the parts thereof, and particularly the part
of said boiler No. 2, known as the rear stay plate

thereof, had become burnt by excessive heat, or strained, bulged or weakened, and to cause due inspection and tests to be made thereof, by competent, skillful, and efficient engineers and inspectors at reasonable intervals, so that defects, burnt condition, bulging, or weakness, due to excessive heat or pressure, could be discovered and thereby guarded against; and that it then and there became and was the duty of defendant to have efficient, skillful, and competent engineers, inspectors, and firemen in control of said boilers, who would properly and skillfully operate, control, maintain, and inspect said boilers as aforesaid.

The declaration alleges the breach of each and all of said alleged duties, and particularly that for a period of time, to wit, for a period of 10 years next preceding said 1st day of November, 1911, said boilers, or any of them, had not been properly tested or inspected by competent, skillful, and efficient engineers and inspectors; that by means of excessive heat and excessive pressure said boilers, and the parts thereof, and particularly the part of said boiler No. 2, known as the rear stay plate thereof, had become burnt, bulged, strained, and thereby weakened, and incapable of sustaining the steam pressure imposed thereon on said last-mentioned date; that a proper inspection and testing thereof, by competent, efficient, and skillful engineers and inspectors, at any time during the period of two years next preceding said date, would have disclosed that said boilers, and the parts thereof, and particularly the part of boiler No. 2, hereinbefore mentioned, were burnt, bulged, strained, and weakened, and were not in a condition reasonably safe to be used and operated as the same were operated on said last-mentioned date, and that the same was not in a condition reasonably safe to sustain the strain of the usual and ordinary steam pressure im-

posed thereon on said date, and would have disclosed the defective condition thereof, thereinbefore mentioned, and that said boilers, and particularly said boiler No. 2, was not properly cared for, or kept in repair, and was operated after the same became out of repair and defective, in that the same had become burnt by overheating, and in consequence thereof strained, bulged, and weakened, which defects and weaknesses aforementioned were, at and before the time aforesaid, unknown to the plaintiff, but were well known to the defendant, or, if not known, should have been in the exercise of due and proper care on its part; and that the explosion thereof, as thereinafter mentioned, resulted from overheating and overtaxing thereof, by means whereof the part of said boiler No. 2, known as the rear stay plate thereof, became burnt, bulged, strained, and weakened, by means whereof the same became liable to and did fail, explode and burst. It is alleged that on said date, while the plaintiff was engaged in such employment of unloading coal at defendant's said factory, and while he was in the exercise of due care and caution on his part, by reason of said negligent acts of said defendant, said boiler No. 2 and the parts thereof, and particularly the part thereof mentioned, and because of the burnt, strained, bulged, weakened, and defective condition thereof, and consequent inability to sustain the steam pressure then and there imposed thereon, failed, exploded, and burst, and escaping steam therefrom enveloped, scalded, and burned plaintiff, throwing him with great violence to the floor, scalding and burning him, and throwing broken parts and débris of said boiler against and upon his body, and plaintiff was severely scalded, burned, bruised, injured, and wounded about his head, back, sides, arms, legs, and body, and all parts of plaintiff's body were deeply scalded and burned, resulting in permanent scars thereof, and

the left side of plaintiff's skull was thereby broken and fractured, so that the broken bone penetrated and injured the brain substance, and so that a portion of the skull was required to be and was thereafter removed, and plaintiff's upper front teeth were thereby forced out and removed, and the sight of the plaintiff's right eye was thereby injured and destroyed, and dust and mud were thereby forced under the skin of plaintiff's face, resulting in permanent disfigurement thereof, and the nerve centers of plaintiff were thereby injured, resulting in loss of power of motion of his right arm, leg, and side, and thereby plaintiff's brain was injured, resulting in disturbance of brain functions and partial loss of memory, and plaintiff was injured by the shock, strain, and concussion he then and there received, and his nervous system was then and there affected and injured, all of which injuries were and always will be permanent.

To this declaration defendant demurred for the following reasons:

"(1) Plaintiff alleges in his declaration that the boiler which failed or exploded had been in use for 10 years, and does not allege that the boiler was imperfectly constructed, nor of improper material. Steam boilers are always dangerous, may explode at any time, which plaintiff well knew, and the defendant was not and could not be required to insure the safety of the boilers.

"(2) If the boiler was overtaxed and subjected to overheating or overpressure, as alleged in plaintiff's declaration, such overtaxing, overheating or overpressure was caused by the fellow-servants of the plaintiff, and he cannot recover.

"(3) The engineer, inspectors, and others in charge of the boilers mentioned in plaintiff's declaration were fellow-servants of plaintiff.

"(4) If the rear plate, or any portion of boiler No. 2, mentioned in this cause, was burned so that it bulged outward and was thereby made weak, as alleged in plaintiff's declaration, that fact was as apparent to

plaintiff as to any one else, and if he continued working in the vicinity of the said boiler and did not give notice of such faulty condition and have the assurance that it would be speedily repaired, he was guilty of contributory negligence and cannot recover.

"(5) If plaintiff's allegations as to the want of inspection, the condition of the boiler No. 2, the rear stay plates thereof, and the other portions thereof, referred to in his declaration, were true, it must long have been well known to plaintiff himself, and if he had given no warning of the defective condition so observable by him, and, as appears by his declaration, he continued to work near and by the boiler No. 2 aforesaid, he was guilty of contributory negligence thereby, persisting in a place of known danger, and he cannot recover."

Said demurrer was overruled by the circuit court, and defendant thereupon applied to this court to have such decision reviewed by certiorari, under the provisions of Act No. 310 of the Public Acts of 1905. The writ of certiorari was denied by us, and defendant now asks us to review such decision of the circuit court by assignment of error herein, in accordance with the provisions of said act.

The defendant having pleaded the general issue, the case came on for trial before a jury. When a full jury appeared the defendant challenged the array, for the following reasons:

"Because the board of jury commissioners of said county did not select the list of names from which said panel of jurors was drawn in the manner prescribed by law therefor.

"Because said board did not select such names making up said list from the proper assessment rolls of the several townships and wards of said county.

"Because, as appears by the records, the said board of jury commissioners used the assessment rolls for the several townships and wards of said county for the wrong year, from which to select said list of names.

"Because the said board did not select the number

of names from all the assessment rolls of the several townships and wards prescribed and required by law.

"Because the drawing from the list prepared by the said board of jury commissioners by the circuit judge, sheriff, and county clerk of the panel of jurors for the March, 1913, term of said court was not conducted in compliance with the requirements of the statute.

"Because it does not appear from the record of the proceedings of said officers that said drawing was properly made from the lists prepared by said board for petit jurors."

The said challenge to the array was overruled by the court, to which ruling the defendant excepted.

Act No. 367 of the Local Acts of 1895 provides a board of jury commissioners for the county of Macomb, and the manner of selecting jurors to serve in the circuit court for said county. Section 2 of this act provides that said board shall meet annually on the first Monday of May in each year, at the office of the county clerk, and shall then and there select from the assessment rolls of the several wards and townships of the said county, for the preceding year, a list of names of persons to serve as petit jurors in the circuit court of the said county for the succeeding year. It provides that the county clerk shall be the clerk of the said board, and shall keep a record of their doings in a book to be provided for that purpose, which record shall, at the close of each meeting of the board, be signed by the members thereof and attested by the said clerk, and shall then be evidence in all courts and places of the doings of the said board. This record was not offered in evidence, so far as appears by this record, and it is impossible to ascertain the actual facts that were before the court upon this inquiry. The defendant claims that the jury commission, at its May meeting in 1912, used the assessment rolls for the year 1912, instead of the assessment rolls of 1911, as the statute required.

After overruling the challenge, the court, after the

jury had been instructed and had retired, permitted the testimony of Mr. Hall, who was the county treasurer in May, 1912, to be taken as to which assessment rolls were used by the jury commission at their annual meeting in May, 1912. He testified that he gave said board the rolls of 1911, and that the assessment rolls of 1912 were not in his office at that time, that said last-named rolls were not in his office at any time in 1912, and that he was positive that the rolls used by said commissioners at the May meeting of 1912 were the assessment rolls of 1911.

It was the further claim of defendant that instead of 10 names being drawn from each ward and township, as required by the statute, they fell short of that in one instance, and only 9 names were drawn, and that there were two jurors on the panel that came from the township where there was a shortage. The local act above referred to provides that at least 14 days before the first day of any term of the circuit court for the said county at which a jury is to be in attendance, the said county clerk shall, in the presence of the circuit judge, and in case of his absence from the county, or of his disability to attend, then in the presence of the probate judge and the sheriff of the said county, proceed to select a jury for the next term of the said court in the manner following:

"The package containing the names of the jurors shall be arranged in alphabetical order, and shall in such order, beginning at 'A,' be separately opened and the slips therein placed in a box to be known as the jury box. The box shall then be shaken in such manner as to thoroughly commingle the slips, and one of the persons in attendance shall draw therefrom one of the slips of paper, and the name appearing thereon shall be a juror for the said term of court; the remainder of the packages shall then be successively treated in the same manner in alphabetical order until such number of persons have been chosen as the said circuit judge shall have directed to be drawn for the

said term, and such persons so chosen shall be the jurors for the said term, and each drawing after the first shall begin at the package next succeeding in alphabetical order the one last used in the preceding drawing. * * * A record of the said drawing shall be kept by the clerk in the same book in which the record of the doings of the jury commissioners is kept. When a name is drawn from the said box, and duly recorded, the slip containing it shall be destroyed and the remaining slips containing the names from the said township or ward shall again be returned to a package and sealed and indorsed as before to await the next drawing."

The certificate of the drawing of the petit jurors for the term of court at which this case was tried was as follows:

"We, the said officers, did proceed to draw the said jurors in alphabetical order; we did first open the package marked 'Ray,' that being the next package succeeding in alphabetical order the one last used in the drawing last before this, as appears by the record of said drawing, and placed the slips therein in a box known as the jury box, caused the same to be shaken so as to thoroughly commingle the slips, and thereupon the county clerk drew therefrom one of the slips which contained the name of Lewis Broughton, and thereupon the remaining slips contained in said package were returned thereto, and the same sealed and closed to wait the next drawing, and in the same manner the following named persons were drawn as jurymen and in the following manner. [Here follow the names and townships from which they came.] The names appearing in the above list being the names appearing on the several slips as so drawn as jurors for the townships and wards set opposite their respective names above, and when in each drawing a record was made of the name, the slip containing the name was destroyed, and said drawing proceeded in said manner until the number of jurors heretofore ordered to be drawn by the circuit judge, to wit, 30, was drawn."

This certificate was dated and bore the signatures

of the circuit judge, sheriff, and county clerk. The objection made to it by the defendant was that it did not appear that the officers followed the packages in alphabetical order. The trial court ruled that it would be presumed that they did unless the contrary appeared, to which ruling defendant excepted.

Upon the trial of the case the plaintiff introduced testimony tending to support the allegations of the declaration. The volume of testimony is too large to warrant us in quoting at length therefrom. It was the claim of the plaintiff that by overcrowding or overheating the said boiler the rear stay plate became bulged or corrugated between the stay bolts, so that the holding strength of the rear stay plate was reduced, and the failure resulted; that this bulging had existed for two or three years prior to the failure; that it was a dangerous condition likely to result in a failure or explosion, and would have been readily disclosed upon due inspection; that the space in the stay sheet had been pressed, or bulged out by the internal pressure to the extent of one-eighth to one-half inch, the effect of which was to pull the threads of the rear stay plate and the stay bolts apart, that is, as the plate pushed out, the threads of the plate and the bolt, commencing at the internal side, would separate; that the internal threads would separate, while the threads on the external side would remain in contact and prevent leaking.

One of plaintiff's witnesses, George Kopoydlowski, a boiler maker, examined the boiler in question in July or August, 1911. Among other things, he testified as follows:

"We went inside of the boiler to look for the leaks and see if there were any leaks in the boiler, and discover any weak spots in it. We examined it by going inside, and through it, and looking over every bit, and seeing if there were any leaks around there; that was our business to do that. We scratched around

it with the chisels, and it shows whenever there is a leak; we don't do much tapping. On that boiler we didn't find any indication of any leaks. I looked at the rear stay plate and examined it.

"*Q.* Did you examine the heads of the stay bolts?

"*A.* We see the bolts. The bolts didn't look good, as I said before; they were peeling off from the sheet a little bit, to tell the truth. We looked at the stay plate, and it was corrugated a little bit, that is all; it wasn't straight. It was corrugated right straight across in the center of it.

"*Q.* How much of the surface of the stay plate was corrugated?

"*A.* I am guessing at it. I had no straight edge on it. I can guess at it, about one-eighth of an inch, and if I say any more or less I am not sure of it. I did not put a straight edge on it to see how much it was corrugated. I think it was raised one-eighth of an inch. I was inside that boiler probably an hour or 20 minutes or so, not any longer. Mr. Henze was there. He did not go inside of the boiler. After I came out of the boiler I had a talk with Mr. Henze, the chief engineer of the company. I told him that 'everything looks tight inside but the bolts.' I told him, 'They don't look very good to me,' and the chief says, 'It don't leak?' And I says, 'No,' and he says, 'Is everything tight?' and I said, 'Yes,' and it was, and he said, 'Fix it so it don't leak.'

"*Q.* What did you say to him that didn't look good?

"*A.* Some of them stay bolts I said they didn't look good to me; that they were peeling off, but they didn't leak.

"*Q.* What was the condition of the stay bolts?

"*A.* That's something I couldn't say, because they didn't leak, and what can I say? They were just peeling off or lifting off from the sheet, and the only way I could fix them was to hammer them over again.

"*Q.* How was the beading on the heads of the bolts?

"*A.* That's what I am talking about; they were lifting off the sheet and were not close enough to the sheet.

"*Q.* Could you see any hammer marks on the beading?

"*A.* The stay bolts would be hard to tell, as they

were all marked up, and they were all pounded up, and you can't tell by the marks on them. There was a test made of the boiler while I was there. The chief engineer, Mr. Henze, tested the boiler. I looked at the gauge a couple of times, but I had nothing to do with the pumps. He put on a cold-water test.

"*Q.* How much pressure did he put on?

"*A.* As I looked at the gauge it was 90 pounds that I could see of cold water.

"*Q.* Did he put on more than 90 pounds of cold water?

"*A.* As I say, I see it 90 pounds, and probably he went up to 95, and may be not any more, as they couldn't get any more from those pumps. * * * I saw the boiler after the accident, laying out in the yard back of the works.

"*Q.* What part of the boiler had failed?

"*A.* The back end of the boiler gave out, the rear stay plate; the back head gave out; the inside she gave out and pulled it out."

John C. McCabe, city boiler inspector of Detroit, a man of experience, testified that he examined the boiler after the explosion and found bulging between the stay bolts; that the plate between the stay bolts had been bulged forward in one place as much as half an inch. He said:

"I found the rear stay plate thrown forward to the tube sheet; I found bulging in between the stay bolts and found marks of the hammer around about the stay bolt ends; around a large number of the stay bolt holes in the stay sheet which failed; I found a portion of the beading of the head showed marks by recent contact with the head, and in a greater portion of the surface where the heads had been in contact, there was no evidence of any contact, but, on the other hand, there were hammer marks showing that the beading had been off for some time.

"*Q.* What was the condition of the beading?

"*A.* The beading had been practically destroyed, and there is evidence that the stay bolts had been very badly hammered up. It was evident that on account of the buckling of the plates there had been leaks,

and the only possible excuse for pounding up the stay bolts was to stop leaks temporarily.

"*Q.* Whether it had been done in a good workman-like manner, hammering up those bolts?

"*A.* That work was entirely wrong, for the reason that it was very evident that the stay bolts were loose; the buckling of the plates necessarily pulled the threads holding the stay bolts from their contact with the stay bolts, and the only possible purpose which it could serve would be to stop temporary leaks. When I made my examination of the boiler, I found the greater portion of the plate above, possibly the third row from the bottom were more or less bulged; the greater bulges appeared to be at the higher part of the plate. Between a half and three-quarters of the stayed sections were bulged more or less. The greatest bulging I noticed was one-half inch, and from that down to one-eighth of an inch, and some three-eighths and some one-quarter. That bulging could not have been caused by the failure of the boiler in question. My calculations show that the plate could not have been bulged from an internal pressure of less than 337 pounds, as it was very evident there was no possible means of getting 337 pounds, or upwards on the boiler, and the only other possible way for it was by an increase of temperature that would reduce the strength of the plate to a point that would admit a bulging from the pressure which was carried on the boiler, which was not to exceed 105 pounds."

The foregoing is but a small part of the testimony of this witness. He further testified that the bulging was the *cause* and *not* the *effect* of the failure of the boiler, in his opinion, and that the stay plate failed because of the weakened condition of the threads of the stay bolts, which would have been readily discernible by proper inspection, and that a proper test of the boiler required a hydrostatic pressure of 150 pounds. It was the claim of the plaintiff that Kopoydlowski did not make an inspection, as that was out of his line of business, but that Henze should have made a proper inspection after it was reported to him that the condition of the bolts was such as to attract the

attention of the witness, in the manner described. On the defense Henze denied that Kopoydlowski made such a report to him, and Prof. M. E. Cooley testified that a bulge in a boiler of one-fourth to one-half an inch is ordinarily of no consequence; that a boiler with bulges in a rear stay plate, or sheet, from one-fourth to one-half an inch is reasonably safe for use, especially so if the stays themselves did not leak.

"*Q.* If a boiler had bulges in it, and it had been repaired, and had afterwards ran for nearly three years without leaking, what would be your judgment as to whether the bulges had any effect on it?

"*A.* The bulges would not have had any effect on its strength in such cases as that. * * * I have investigated the boiler in this case very thoroughly. My first examination of it was on January 22d, the second about May 5th, then the third last Friday, all in this year. The examination I made last January was very brief, and in expressing my opinion after that time, I took the testimony taken in the case to guide me, and it occurred to me then that the explosion might have resulted from the tearing away of the tube sheets, as was set up in that testimony, but my later examination showed that this was not the cause of the explosion, but rather the result of it. The condition of the fractured edges of the plate itself satisfied me as to this.

"*Q.* What, in your judgment, caused the failure of that boiler?

"*A.* After careful examination of the boiler itself, and the study of the testimony introduced in the case, I reached the conclusion that this explosion could not have been caused by the giving way of the stays, and when I came down and spent the afternoon examining the boiler, after the first time, I discovered another fracture which I had not found before, and which has not been referred to before in this case. I mean the fracture which is shown in this sketch by the heavy black line near the upper left corner of the combustion chamber, where the crown sheet joins the curtain sheet. I did not know this existed, until I looked into the boiler, and the first examination of

182 Mich.—30.

it disclosed all the earmarks of an initial rupture. For boiler explosions are made up of two parts, first, an initial rupture; the boiler gives way and drops, the pressure and the water and steam together create and form a pressure, which ruptures and tears the boiler all to pieces. The difference between a failure and an explosion is that when a boiler fails in some particular place, it lets the water and steam out without exploding and blowing the boiler asunder; both a failure and an explosion must have an initial rupture. This initial rupture is splendidly shown in Exhibit No. 15. You can see from this exhibit that the torn edges of the plate are doubled over and bent around, something like a seam of a hem on a garment, and the calipers show that the thickness of the plate where it is torn has not been reduced. It is 7/16, as near as I could measure it, and that indicates that it was torn like the plate at the manhole, but that it broke off, and it broke off like that to give way, the steam rushing out, caused these edges of the plate to turn around into the form of a seam. * * * There was no evidence whatever, visible to the eye, that the tube sheet had ever been burned, nor did I see any evidence that it had been overheated. I noticed the bulges in the stay sheet, at the time of my examination, and from it I should say unhesitatingly that they were more of the result of the explosion, and I still think so, notwithstanding other testimony to the contrary. Those bulges were all the result of, and not the cause of, the explosion. I have listened to Prof. Bragg's testimony as to the design of this boiler, and to me it seems perfectly correct. He is perfectly right in emphasizing the fault, due to the location of that outer row of stay bolts, next to the crown sheet. He might have emphasized more strongly the effect of expansion on the top row of tubes, the top of the combustion chamber, back to this top row of stay bolts, that under a difference in temperature, increased in length 3/16 of an inch; he might have emphasized more strongly the effect of that elongation on the bending of this plate, in the vicinity of this seam, which would start this initial rupture, and that in my judgment is what caused that plate to kick back and forth and start it. The location of these stays so close in the curve of the stay

plate practically amounts to the expansion of the plate itself, and the riveting of it to the rear head of the boiler.   This holds the plate as if in a vise, and expansion and contraction must have the effect of bending back and forth the plate in that vicinity.   They should have been placed several inches away from this rigid point to allow for the plate to bend.   Those stay bolts, in the position they were in, were of no practical use, but did actual harm; they should have been located away from this sheet to give a chance to bend.   As a result the bolt next to this is forced away beyond its capacity, and tends to strip the thread of the bolt.

"*Q.* What connection would that have with the initial rupture?

"*A.* If the threads were stripped off, it would produce a bigger load, would throw a bigger load on this same joint, and also a strain on the fracture itself. This Scotch marine boiler I have known to be in common use for nearly 40 years.   The bulging itself is not particularly dangerous.   If there was to be any bulging, due to low water, it would take in the crown sheet, and that is one reason why I thought this could not be due to overheated plates.   Another reason is that if these plates had been heated to the point which would permit bulging, the bulging would not have stopped at $\frac{1}{8}$ or $\frac{1}{4}$ of an inch.   *   *   *   I take it that this bulge in the stay plate could not have been caused in the way stated, and as a matter of fact that could not be the source of any particular weakness in the boiler.   *   *   *

"*Q.* State whether or not, in this boiler, it is possible for the heat to become so intense that the water is driven away from the rear stay plate?

"*A.* That is not possible, and you can speak with a great deal of positiveness on that; it is not possible for a blanket of steam to form next to the plate. *   *   *

"*Q.* Please give your attention to this answer: 'In a boiler of this construction, the products of combustion, owing to their velocity and quantity, naturally throw back and strike this rear stay plate before they can return, and enter the tubes to carry them off. On account of the intensity of the fire, the rate of generation of steam is very rapid on this plate, and

in the generation of the steam it rises on the face of the plate, and by the time the steam from the lower portions unite with the steam generated higher up, it makes considerable of a blanket between the water and the plate, and in cases where the firing is extreme, or where there is scale, sediment, oil, or any other semi or non conductor in the water, there is great danger in overheating the plate, and causing bulging at comparatively low pressure.' What do you say to that?

"*A.* I say there is nothing to it at all; it cannot possibly happen.

"*Q.* In case the stay bolts are 7½ inches apart, would a bulging of less than a quarter of an inch, in your judgment, cause it to leak at the stay bolt?

"*A.* I shouldn't expect it would.

"*Q.* What effect has the beading on the stay bolt, in adding to the holding strength of the bolt, if any?

"*A.* I think it adds a little, and it depends on the amount of the beading, and how well it is done; the beading in these boilers, I don't think added greatly to the strength. * * *

"*Q.* What do you think of this testimony: 'Whether a boiler whose stay plate bulges between the stay bolt a quarter of an inch would be in a reasonably safe condition for use depends in a measure on the pitch of the boiler; as regards to this particular boiler, it would not be in a good, reasonable, safe condition?'

"*A.* In my judgment the boiler would be safe under those conditions.

"*Q.* What do you think of this testimony: '*Q.* Do you think that a boiler with a bulge in it of an eighth to a quarter of an inch, where the stay bolts are 7½ inches apart, would affect the threads on the stay bolts? *A.* Absolutely it would?'

"*A.* It might affect them a little theoretically, but practically not at all; if it did, leaks would result, which would be discovered at once, or very soon.

"*Q.* What do you think of this testimony: 'I don't think that the failure of this boiler was due in any way to the construction of the boiler?'

"*A.* To my mind it lies altogether on the design and the construction of the boiler, and that is the cause of the failure."

There was other testimony to the same effect; also that a chemical examination of the stay plate of the boiler disclosed that for all purposes it was as it should be, and showed absolutely no trace of burning in the plate, and that the same was true of the stay bolts. In rebuttal there was testimony to the effect that the construction and design were proper, and that the crack referred to by Prof. Cooley was the result of the failure and not the cause of it.

In the course of his argument to the jury one of plaintiff's attorneys said:

"The testimony that we have produced is from workmen. We haven't tried to go to Ann Arbor or to the university to produce theoretical men, and men that have never seen a boiler before."

This remark was excepted to by defendant's counsel, whereupon plaintiff's attorney said:

"Can I proceed without interruption?
*The Court:* Counsel have a right to interpose an objection. The jury will remember the facts."

At the request of defendant's counsel three special questions were submitted to the jury. They were as follows:

"1. Was the rear stay sheet in the boiler in question overheated before November 1, 1911?
"2. Was the rear stay sheet of the boiler in question burned prior to the accident on November 1, 1911?
"3. Did the bulges in said stay sheet, being one-eighth to one-quarter of an inch in depth, affect the stay sheet so that it was not reasonably safe on November 1, 1911?"

Each one of said special questions was, by the jury, answered in the affirmative.

The court declined to submit the following special question:

"4. Did the first break in the boiler, when the accident happened on November 1, 1911, occur in the

spot marked in black on 'Exhibit 5,' and shown in the photo 'Exhibit 15,' being in the upper left-hand corner of the combustion chamber?"

To which ruling defendant's counsel excepted.

The trial resulted in a general verdict for the plaintiff in the sum of $7,000. There was a motion for a new trial by defendant, the third ground therefor being: "The verdict is contrary to the evidence given in the case." This motion was denied as not supported by the record, and counsel for defendant duly excepted. The defendant has brought the case here upon writ of error, and there are 91 assignments of error.

1. The first assignment of error is to the effect that the court erred in overruling defendant's demurrer to the declaration. In considering the first ground of demurrer, we think it sufficient to say that, as we understand the declaration, the plaintiff does not seek to recover on the ground that the boiler was imperfectly constructed, nor because of improper material.

The second and third grounds of the demurrer raise the question of fellow-servants of plaintiff. Some portions of the declaration may be treated as surplusage, yet the duty to inspect is clearly alleged, as well as the breach of that duty. We have frequently held that this duty is nondelegable. The duty of inspection, when required by the circumstances of the case, cannot be delegated by the master in such manner as to avoid responsibility. *Van Dusen* v. *Letellier*, 78 Mich. 492 (44 N. W. 572); *McDonald* v. *Railroad Co.*, 108 Mich. 7 (65 N. W. 597); *Orso* v. *Engineering Works*, 164 Mich. 568 (129 N. W. 673); *Druck* v. *Lime Co.*, 167 Mich. 154 (132 N. W. 492); *Scendar* v. *Copper Co.*, 169 Mich. 665, 669 (135 N. W. 951).

The fourth and fifth grounds of demurrer are to the effect that if the boiler was defective as alleged,

the fact was as apparent to the plaintiff as to the defendant, and that he was guilty of contributory negligence in continuing in a place of known danger. We have called attention to the allegation in the declaration "that the defects in the boiler were, at and before the time aforesaid, unknown to the plaintiff," and it is also alleged that plaintiff was in the exercise of due care and caution on his part. We passed upon this question in *Cristanelli* v. *Mining Co.*, 154 Mich. 423, at page 429 (117 N. W. 910). We are of the opinion that the court did not err in overruling the demurrer.

2. The second assignment of error relates to the action of the trial court in overruling defendant's challenge to the array. We are of opinion that in the state of this record it sufficiently appeared that the assessment rolls of the proper year were used by the jury commissioners. The rolls of 1912 were not yet completed. In any view of the matter we do not think that the challenge to the array could be sustained upon that point. *Niles* v. *Schoolcraft Circuit Judge,* 102 Mich. 328 (60 N. W. 771).

The other point raised as to the conduct of the jury commissioners is disposed of by our ruling in *People* v. *Macgregor,* 178 Mich. 436 (144 N. W. 869).

Further, it was claimed by defendant that only two jurors in the panel came from the township where there was a shortage, and the record does not show that the defendant exercised any of its peremptory challenges. The certificate of the circuit judge, sheriff, and county clerk, as to the drawing of petit jurors for the term is not open to criticism, for it expressly appears that they "did proceed to draw the said jurors in alphabetical order." In our opinion the court did not err in overruling the challenge.

3. The next 72 assignments of error relate to rulings, at the trial, in passing upon the admissibility of testimony. We have given them all very careful con-

sideration, and have read the entire record, and are of the opinion that the court therein did not commit reversible error.

4. It is claimed that the court erred in refusing to direct a verdict for the defendant at the close of the evidence, for the reason that plaintiff had failed to make out a case. We do not think that the court erred in that particular.

We have quoted enough of the testimony to show that upon the principal questions involved, there was a sharp conflict as to the facts and the conclusions to be drawn therefrom. It was the claim of plaintiff, and there was evidence tending to support it, that the boiler in question had been installed for 10 years; that two or three years before the failure the boiler had been operated at a time when there was little or no water in it, resulting in overheating it; that at the time the fires were drawn it was discovered that the stay bolts had been loosened, and that there were corrugations in the rear stay plate.

Just prior to the campaign of 1911 a witness testified that he discovered the bulging and the condition of the stay bolts, as above set forth; he testified that he reported this condition to Henze, defendant's chief engineer, who, it is claimed, made no effort to cause an inspection of the boiler to be made.

Upon these claimed facts the plaintiff invokes the application of the doctrine stated in *Woods* v. *Railway Co.*, 108 Mich. 396 (66 N. W. 328), that while not an insurer, it was defendant's duty to use reasonable and ordinary diligence in providing safe machinery and appliances in the first instance, and, by continued inspection at such intervals as the reasonable and proper conduct of such a business requires, to ascertain whether the appliances continue in safe condition, and, if unsafe, to put them in safe condition; that to the extent that this duty of inspection

goes, it is the master's duty, which he cannot escape or delegate.

5. The seventy-seventh assignment of error complains of that part of the argument of plaintiff's counsel above set forth. The argument was improper and unfair, as it was to the effect that all of defendant's witnesses from Ann Arbor had never seen a boiler. The fact was that the witnesses Cooley and Bragg had had large experience with boilers. But we think that the error was cured by the remark of the court that the jury would remember the facts. In the main charge the court also particularly called the attention of the jury to their duty to recall and be governed by the evidence.

Referring to the other assignments of error upon other parts of the argument, it is only necessary to say that the record shows that defendant's counsel simply excepted to the remarks of counsel, and it does not appear that the attention of the court was called to the matter, or its ruling secured. We have so often and so recently ruled upon this subject that a reference to the cases is hardly necessary. *People v. Auerbach,* 176 Mich. 23-48 (141 N. W. 869) ; *People v. Danenberg,* 176 Mich. 337-339 (142 N. W. 347).

6. The eighty-third assignment of error is to the effect that the court erred in charging the jury as follows:

"Now, gentlemen, having in mind the instructions given you and the opposing theories of the parties, you are further instructed that the plaintiff's right to recover will be largely governed by two essential facts:

"*First.* Had the stay sheet and connecting stay bolts of the boiler in question become so defective and out of repair as to make the boiler more dangerous than a boiler in reasonably good repair?

"*Second.* If the stay sheet and connecting stay bolts were not in a reasonably good repair, and had become defective and dangerous because of such de-

fective condition, did Mr. Henze, the engineer in charge, have notice of this condition?

"Or, if he had no actual notice, were the stay sheet and stay bolts so out of repair that the company, in the exercise of reasonable care and prudence, should have made further examination, and discovered and repaired the defects?"

In view of other portions of the charge upon the subject of the duty of inspection, and in view of the special questions submitted at defendant's request, we do not think that the court erred in giving the above quoted instructions.

7. The eighty-fourth assignment complains of the following language of the charge:

"The mortuary tables show that a man of his age has an expectancy of life of 33 years. That is shown by mortuary tables which are in use in this State, and it is a proper guide to you as to the probable duration of the man's life."

This language was prefaced by the following:

"If, under the proofs, you find that plaintiff's injuries are permanent, then you will include in your award a sum of money to compensate him for loss of ability to earn a livelihood at common labor during the future years, not exceeding his expectancy of life."

Defendant presented no requests to charge upon this subject, and as there was evidence tending to show that plaintiff's injuries were permanent, and as to his condition at the trial, we think that the charge upon this subject falls within the rule stated by us in *Belmer* v. *Tanning Co.*, 160 Mich. 669-678, 679 (125 N. W. 726).

8. The eighty-fifth assignment of error is that the court erred in refusing to submit to the jury the fourth special question submitted by the defendant. We are of opinion that, in view of the other questions submitted to the jury, it was not error to refuse to

submit the fourth.   We do not think that the answer to this question would have been conclusive.   We doubt, if this question had been put and answered as the defendant desired, if it would have overruled a general verdict for the plaintiff.   *Power* v. *Harlow,* 57 Mich. 107 (23 N. W. 606).

9. Error is assigned because the court denied defendant's motion for a new trial.   Turning to the motion we find that the second ground stated is that the court erred in not charging the jury as requested by the defendant in its several requests, which were refused by the court.   An examination of the record discloses that defendant's requests to charge cover six pages of the printed record.   An examination of them shows that some were given by the court, and some clearly should not have been given.   The assignment of error is too general to be considered, under our repeated decisions.   *Green* v. *Brookins,* 23 Mich. 48 (9 Am. Rep. 74) ; *Tupper* v. *Kilduff,* 26 Mich. 394; *Finch* v. *Karste,* 97 Mich. 20 (56 N. W. 123) ; *Wanner* v. *Mears,* 102 Mich. 554 (61 N. W. 2) ; *Snyder* v. *Patton & Gibson Co.,* 143 Mich. 350 (106 N. W. 1106) ; *Nissly* v. *Railway Co.,* 168 Mich. 676 (131 N. W. 145, 135 N. W. 268, Ann. Cas. 1913C, 719).

Another ground of the motion was that the verdict is contrary to the evidence given in the case.   We do not think that this assignment raises the question whether the verdict was contrary to the overwhelming weight of the evidence.   We are of opinion that there was evidence to support the verdict, and it would seem from the result that the jury believed such evidence.

10. The ninetieth assignment of error is to the effect that the court erred in refusing to admit in evidence the records of the circuit court of Macomb county in the case of the plaintiff v. Detroit, Mt. Clemens & Marine City Railway, in an action in which he

recovered $1,500 damages for personal injuries. 151 Mich. 260 (115 N. W. 43). Counsel for defendant does not give us the page of the record where this offer was made, and a patient examination of the printed record has failed to disclose any such offer. Plaintiff was cross-examined on the subject of such suit, and he testified that he recovered such sum for an injury in 1905. His physician testified that there was no relation between plaintiff's condition at this trial, and the injury from which he suffered at that time. No error is presented by this assignment.

Finding no reversible error in the record, the judgment of the circuit court is affirmed.

McALVAY, C. J., and BROOKE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.