TAUTENGAN *v.* ZOLLER.

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE.
   On appeal from a directed verdict, appellant's testimony should be given the most favorable construction it will bear.

2. MASTER AND SERVANT—PERSONAL INJURIES—NEGLIGENCE—QUESTION FOR JURY.
   In an action for personal injuries received by a servant when a scaffold on which he was working gave way, the negligence of the master, who had not elected to come under the provisions of the workmen's compensation law, *held*, a question for the jury, under the evidence. BROOKE and FELLOWS, JJ., dissenting.

Error to Wayne; Codd, J. Submitted January 8, 1918. (Docket No. 11.) Decided March 28, 1918.

Case by Joseph Tautengan against Ernest Zoller for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed.

*Harry J. Lippman*, for appellant.
*Zimmer & Chedester*, for appellee.

MOORE, J. The plaintiff, a carpenter, was engaged by the defendant to do carpenter work on a house in Detroit. The plaintiff was injured by falling from a scaffold under such circumstances as he claims makes his employer liable to him in damages, to recover which he brought this suit. At the close of the testimony offered by the plaintiff the circuit judge instructed the jury that

"This case is brought by the plaintiff against the defendant, who has not elected to come under the provision of the workmen's compensation act, passed by

the legislature in 1912, being Act No. 10. That act provided that in the event that an employer does not elect to come under the workmen's compensation act, in event of a suit against him for injuries caused to persons in his employ, that the following defenses are not available to the defendant: *First,* That the employee was negligent, unless it should appear that said negligence was wilful. *Second,* That the injury was caused by negligence of a fellow employee, and that the employee had assumed the risk arising out of the employment or arising from a failure to provide and maintain suitable appliances, etc. Therefore, gentlemen of the jury, it is my duty to eliminate such defenses. * * * However, there can be no recovery in a case of this character, in the absence of evidence of negligence on the part of the defendant."

The judge was of the opinion that the accident was caused by a latent defect not discoverable by inspection, for which defendant was not responsible, and directed a verdict in his favor. The case is brought to this court by writ of error.

We are not favored with a brief on the part of the appellee. There are many assignments of error discussed by counsel for the appellant, but they all depend upon whether the judge erred in directing a verdict instead of submitting the question of negligence to the jury.

In considering appellant's contention, we must give the most favorable construction it will bear to the testimony offered on his behalf. The plaintiff and a fellow workman were at work putting up a cornice, while standing upon a platform consisting of planks laid upon metallic brackets. The perpendicular side of these brackets had lugs or projections that slipped into slots cut in the sheathing boards nailed to the studding of the house. The perpendicular side of the bracket was riveted to the other parts of the bracket. The head of the upper rivet pulled out of the hole through which it passed, the other part of the bracket gave

way and the plaintiff was thrown to the ground, about 20 feet below, and was severely hurt. The other man on the platform caught hold of the cornice and was rescued uninjured.

The plaintiff testified in part as follows:

"*Q.* Did you test that scaffold that morning?

"*A.* Yes.

"*Q.* Why?

"*A.* Because we tested that way. When we put up the scaffold the brackets were looking weak, and rusty, and I did not trust it right away, so I thought I would test it to see if they were safe.

"*Q.* What do you mean when you say, 'They looked weak'?

"*A.* Rusty, and some were bent. The bracket that fell looked good. It was a little bent at the top but otherwise the rivets looked good.

"*Q.* Based upon your experience as a carpenter for eleven years would you say that this one bracket was heavy enough for this sort of work?

"*A.* Not quite heavy enough. I kicked right away.

"*Q.* What kick did you make?

"*A.* I told him that they were not safe. They were too weak and old and rusty.

"*Q.* You told him that when he brought them?

"*A.* Yes.

"*Q.* What did he say?

"*A.* He said 'They are all right. They are strong enough to hold you and two or three more.' He said, 'put them up they are all right.'

"*Q.* Did you put them up because he told you to put them up?

"*A.* Yes.

"*Q.* If he did not tell you to put them up would you have used them?

"*A.* No, I wanted to build a wooden scaffold,—I had before—and he would not let me. I asked him the day before, and he said he would have the brackets there. He said he would bring his iron brackets up. He said, 'Don't build a wooden scaffold.' I myself hung the bracket that fell, and I cut the hole into which to hang it an inch and a half by an inch and a quarter. When the bracket was in that hole, it was entirely solid. I

put a shingle behind the hooks. Exhibit 10, shown me, is the same sort of a bracket that I used on that day.

"*Q.* Did you consider this bracket heavy enough to use on that sort of work?

"*A.* It is kind of weak for a high scaffold.

"*Q.* Did you tell Mr. Zoller that?

"*A.* Yes, I told him.

"*Q.* And then he told you to go ahead and use them?

"*A.* Yes.

"*Q.* That it would hold you and two or three more?

"*A.* Yes."

The man who was on the scaffold when it fell corroborated this testimony in all its essentials.

The following appears in the testimony of defendant:

"Where had you had these brackets before you brought them to the job?

"*A.* Stored in my barn.

"*Q.* How long had they been in your barn?

"*A.* They had been in and out from one job to another—perhaps within a week or two, perhaps a month.

"*Q.* Did you look these brackets over before you brought them to the job on Wilson street?

"*A.* No. I didn't look them always—didn't look them over, but the orders were 'always be careful about the brackets and examine them before you put them up.'

"*Q.* Why?

"*A.* Because when you take down a scaffold to the ground, the ground is sometimes frozen and if they are dropped down and hit brick or stone or frozen ground, they generally spring something.

"*Q.* It might spring a rivet?

"*A.* It might sometimes.

"*Q.* So your instructions were to be careful with the brackets?

"*A.* Yes.

"*Q.* You were afraid of them?

"*A.* I was always afraid of a scaffold myself because I had a few falls.

"*Q.* How did it happen before you brought them over that you did not examine them yourself?

"*A.* I expected the men to build the scaffold and examine the brackets. I told them to be careful and every time they built a scaffold to be sure and drive plenty of nails in for the hook—where the hook goes behind the sheeting.

"*Q.* You expected when you told the men to be careful that it was up to them to be careful?

"*A.* Yes, sure.

"*Q.* It was up to him to look after the bracket and see that it was all right?

"*A.* Yes.

"*Q.* And you were through with it when you had given it to him?

"*A.* Yes.

"*Q.* After the brackets were delivered and put in use, did you go around there and inspect the brackets?

"*A.* No, sir. He could put them up himself. He knew how.

"*Q.* Did you inspect this bracket that fell?

"*A.* No—yes. I inspected it the next morning when I found it standing where it fell.

"*Q.* You mean the next morning after it fell?

"*A.* Yes.

"*Q.* Well, I mean before it fell?

"*A.* No.

"*Q.* You never inspected any of these brackets before the morning after it fell?

"*A.* I did not inspect any of them."

He also testified:

"The scaffold upon which the men were working the day it fell was put up possibly two or three days before. I saw that particular piece of scaffold every day and they did not have any studding under it. The same day it fell I told them to put studding under it. That was the first time I told them that; they then had it ready for the cornice."

Both of the men on the scaffold denied that he gave any such direction.

In view of this testimony, we think it was error to refuse to submit the question of the negligence of the

defendant to the jury.   See *Johnson* v. *Spear*, 76 Mich. 139; *Tangney* v. *Wilson & Co.*, 87 Mich. 453; *Anderson* v. *Railroad Co.*, 107 Mich. 591; *McDonald* v. *Railroad Co.*, 108 Mich. 7; *Woods.* v. *Railway Co.*, 108 Mich. 396; *McLean* v. *Railroad Co.*, 137 Mich. 482; *Carnell* v. *Halpin*, 159 Mich. 42; *Maki* v. *Mining Co.*, 176 Mich. 497; *Eberts* v. *Sugar Co.*, 182 Mich. 449.

The judgment is reversed, and a new trial ordered, with costs to the plaintiff.

OSTRANDER, C. J., and BIRD, STEERE, STONE, and KUHN, JJ., concurred with MOORE, J.

BROOKE, J. (*dissenting*).   The learned circuit judge, in directing a verdict for the defendant in this case, assumed it was the duty of defendant to provide safe machinery and appliances for the plaintiff, and by continued inspection at proper intervals to ascertain whether the appliances continued in a safe condition, and, if not in a safe condition, to put them in a safe condition.   He held, however, that the injury to plaintiff was caused by a latent defect in the bracket, and that an inspection by defendant would not have discovered the latent defect.

I am of opinion that this instruction was warranted by the testimony of John Neff, a witness sworn on behalf of the plaintiff, who gave a circumstantial account of the daily inspection in the following language:

"The brackets were made like a bracket on a building, a brace down this way; they were riveted, like building brackets.   The two parts on the top of the bracket are riveted and the bottom of the bracket hooks together.   The accident happened the fifth day that we had used the brackets.   I put some of the brackets up and Mr. Tautengan put some of them up. Some of the brackets on the building were put up by Mr. Zoller's son.   The bracket that broke was on the north side of the building.   Mr. Tautengan put that bracket up, and I helped him.   I took the bracket and

examined it and handed it to Mr. Tautengan. He examined it and put it up. I examined the rivets and then handed them to Mr. Tautengan, and the rivets were all right when I examined them. There were about three brackets on that one piece of scaffold that fell down, and I examined all of those three brackets. When I handed the brackets to Mr. Tautengan he examined them and then put them up. I saw him examine them and I saw him put them up. I was there. After he put them up I went up there to see whether they were all right, and they were hooked in right. Every day before I went on the platform I examined the brackets. We tested them when we got on the scaffold by our weight and they were all right. Before starting to work, in order to test them, we would take hold of the studding and put our weight on it to see if they were strong. I did that every day before starting to work, and so did Mr. Tautengan. Each bracket was all right."

Judgment should be affirmed.

FELLOWS, J., concurred with BROOKE, J.